THE AMERICAN EXCHANGE NATIONAL BANK, Respondent, *v.* THE WOODLAWN CEMETERY, Appellant.

**Cemetery associations — certificate of ownership of stock therein — rights of assignee thereof.**

A cemetery association does not occupy the same position toward a community as does a corporate body organized for purposes of commercial dealings. It is a membership corporation not organized for pecuniary profit but for the more effective accomplishment of an object of mutual interest, namely, the purchasing of property as a place for the burial of the dead, for the use of the members or their grantees and the securing of a permanent management through the instrumentality of trustees of their own appointment.

A certificate issued by a cemetery association under chapter 133 of the Laws of 1847, and amendatory acts, in the following form: "This certifies that ———— is entitled to ———— shares in the Woodlawn Cemetery, transferable only on the books of the Cemetery Association upon the surrender of this certificate," is in legal effect a non-negotiable promise to pay money.

The treasurer of Woodlawn Cemetery had in his custody certificates of the association signed in blank by the president and assistant secretary. The treasurer filled out the certificates in his own name and obtained a loan thereon without the transfer to him on the books of any outstand-

ing shares, and without the previous surrender of any certificates. *Held*, that the certificates were in law and in effect only promises to pay money and were non-negotiable; that the holder was chargeable with notice of the statutory restrictions upon the powers of the corporation and of its incapacity to issue anything under its contract, except certificates of indebtedness; that the plaintiff took the certificates from its assignor with no other rights against defendant than the assignor possessed, and that plaintiff could not recover thereon. (Distinguishing *New York & New Haven Railroad Co.* v. *Schuyler*, 34 N. Y. 30.)

*American Exchange Nat. Bank* v. *Woodlawn Cemetery*, 120 App. Div. 119, reversed.

(Argued November 16, 1908; decided January 12, 1909.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered June 19, 1907, affirming a judgment in favor of plaintiff entered upon the report of a referee.

This action was brought by the plaintiff to recover, by way of damages, the loss occasioned to it from having made a loan of money upon spurious certificates of shares, which had been fraudulently issued by one of the officers of the defendant. The defendant was a cemetery association, organized and existing under chapter 133 of the Laws of 1847 and the acts amendatory thereof. In May, 1864, the defendant made a written contract for the purchase of land for cemetery purposes and agreed therein to pay, as the consideration thereof, one-half the proceeds of all sales of lots or plots made from the said lands. The contract provided that the said half of said proceeds was to be divided into twelve thousand five hundred equal shares ; that the shares were to be distributed among the grantors of the lands and that one or more certificates were to be issued to each of the grantors for his shares ; that said shares should be personal property and that they should be transferable by the said persons, or their legal representatives, on the books of the defendant, upon the surrender of the certificates. The defendant, from time to time, issued certificates, representing the shares of the various grantors under the said written contract, in the following form:

"No. ——. Whole number of shares, 12,500. —— Shares.

"This certifies that            is entitled to shares in the Woodlawn Cemetery, transferable only on the books of the Cemetery Association upon the surrender of this certificate.

"In testimony whereof, the Woodlawn Cemetery have caused this certificate to be signed by their President and countersigned by their Treasurer in the City of New York, this        day of        .

"Countersigned.

"            , *Treasurer.*                    , *President.*"

In the year 1893, Caleb B. Knevals, at the time vice-president and treasurer of the defendant, had in his custody three certificates, which had been signed in blank by the president and assistant treasurer, the officers then empowered to sign, and had been left with him for the purpose of being filled out and delivered to persons entitled thereto, when required in the course of defendant's business. Knevals filled up each of said certificates in his own favor, by inserting his name, without the transfer to him on the books of any outstanding shares and without the previous surrender of any certificates. These three certificates were spurious and fraudulent, and constitute an overissue of certificates, under the contract aforesaid. As filled up, these certificates represented, in the aggregate, 224 shares. Attached to each of the certificates was a blank form of irrevocable transfer thereof, in printed form and similar to that used in the transfer of ordinary stock certificates. In November, 1900, Knevals presented to the plaintiff the three certificates of shares, with the transfers attached thereto and signed in blank, and applied for a loan of $36,000 to himself, on the security thereof. The application was granted and the plaintiff made the loan. In November, 1901, the plaintiff demanded of the defendant a transfer to it of the number of shares represented by the three certificates, which the defendant refused to make, because of the said certificates constituting an overissue. Thereafter, the

plaintiff tendered the certificates to the defendant and offered to surrender the same upon the payment of the amount of its loan; which payment was also refused by the defendant.

Upon these facts, as found by the referee, before whom the trial was had, judgment was directed in favor of the plaintiff and the judgment, so recovered, was affirmed by the Appellate Division, in the first department, by a divided vote of the justices. The defendant has appealed to this court from the judgment of affirmance.

*George A. Strong* and *William S. Opdyke* for appellant. The instruments in question are and must be merely non-negotiable promises to pay money, and plaintiff, as the holder of these, occupies no better or other position than Knevals himself. (*People* v. *Comrs.*, 106 N. Y. 64; *Erkenbrach* v. *Erkenbrach*, 96 N. Y. 456; *People* v. *Dennison*, 84 N. Y. 272; *Hood* v. *Hood*, 85 N. Y. 561; *Baker* v. *Leland*, 9 App. Div. 365; *Dinsmore* v. *Duncan*, 57 N. Y. 573; *Mechanics' Bank* v. *Straiton*, 3 Keyes, 375; *Zander* v. *N. Y., etc., Co.*, 178 N. Y. 208; *Westbrook* v. *Gleason*, 79 N. Y. 23; *Owens* v. *Evans*, 134 N. Y. 514.)

*Benjamin N. Cardozo* and *Edgar J. Nathan* for respondent. The defendant is liable for the acts of its officers in issuing the certificates. (*N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 49; *Jarvis* v. *M. B. Co.*, 148 N. Y. 652; *H. Nat. Bank* v. *A. D. & T. Co.*, 148 N. Y. 612; *F. A. Bank* v. *F. S. St. R. R. Co.*, 137 N. Y. 231; *Titus* v. *G. W. Turnpike Co.*, 61 N. Y. 237; *Bank* v. *Lanier*, 11 Wall. 369; *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 199; *F. & M. Bank* v. *B. & D. Bank*, 16 N. Y. 125; *Holbrook* v. *N. J. Zinc Co.*, 57 N. Y. 616; 1 Purdy's Beach on Corp. 409.) The defendant had the power to issue these certificates, and its charter does not exempt it from liability for the torts of its agents. (L. 1847, ch. 133; L. 1853, ch. 122; *Pusey* v. *N. Y. R. R. Co.*, 14 Abb. Pr. [N. S.] 434; *Atty.-Gen.* v. *L. Ins. Co.*, 9 Paige, 470; *Barker* v. *M. F.*

*Ins. Co.*, 3 Wend. 94; *Kelley* v. *Mayor*, 4 Hill, 263; *Moss* v. *Oakley*, 2 Hill, 265; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 49; *Bissell* v. *R. R. Co.*, 22 N. Y. 258; *Vought* v. *E. B. & L. Assn.*, 172 N. Y. 508, 518; *C., etc., R. R. Co.* v. *Howard*, 178 U. S. 160; *Mimms* v. *M. V. B. School*, 160 Mass. 177; 2 Purdy's Beach on Corp. 1352; Cook on Corp. [5th ed.] 70.)

GRAY, J. It is the contention of the plaintiff that the defendant is liable to it for the loss sustained from the making of a loan upon spurious certificates of shares. As they were fraudulently issued by one of its officers, it is responsible, it is claimed, for his wrongful act, within the rule of law established by the decision in the case of *New York & New Haven R. R. Co.* v. *Schuyler* (34 N. Y. 30, 49). The argument maintains that, as the defendant had power to issue such certificates and as its charter did not exempt it from liability for the acts of its agents, if they abused their authority, it must be responsible for any injury resulting. The argument rests itself upon the principle that when an agent is clothed with power to do an act, upon the existence of some extrinsic fact, necessarily and peculiarly, within his knowledge, and of the existence of which fact the act is a representation, as to a third person dealing in good faith with the agent, the defendant is precluded, or estopped, from denying its truth to his prejudice. The law of estoppel is, thus, invoked in aid of the plaintiff's case and whether it is available turns upon a consideration of the powers and duties, with which the statutes have invested the defendant, and of the nature of the transaction with the agent. Its application is involved with the question whether, if the certificates are non-negotiable instruments, the plaintiff could claim exemption from the operation of the rule governing the rights of an assignee of such. The record discloses an issue of certificates of shares by the defendant, each of which, in terms, was made " transferable only on the books of the Cemetery Association upon the surrender of the certificate." What the

warrant for their issue, what they evidenced and what rights, if any, passed to an assignee, differing from, or independent of, his assignor's, are questions to be answered by a reference to the statutes and to the rules of law governing dealings in instruments of a non-negotiable character. That these share certificates are, inherently, non-negotiable instruments is conceded and, within the general rule, that a non-negotiable instrument is always subject to the defenses existing between the original parties, the plaintiff should occupy no better position towards the defendant than did its assignor, Knevals, the defaulting officer. (*Bush* v. *Lathrop,* 22 N. Y. 535; *Fairbanks* v. *Sargent,* 104 ib. 108, 116.) But it is claimed that, conceding the certificates to be non-negotiable, nevertheless, the defendant sought to give them a degree of negotiability and is estopped to deny their authenticity. Is the plaintiff's case taken out of the operation of the general rule as to that class of instruments and does it fall within that which has been applied to the issue of ordinary certificates of stock by stock corporations, organized for purposes of business gain and profit, and which was asserted in the *Schuyler* case? If we hold that it does, then I think it to be evident that we shall be extending, unduly, the doctrine of liability asserted in that case; which decided the responsibility of a railroad company for the damages caused by the acts of Schuyler, its president and transfer agent, in fraudulently issuing and transferring certificates of stock in excess of its authorized capital stock. The corporation was held to be "estopped, by the facts and circumstances of the case, to deny Schuyler's authority to do the acts." It was considered that the responsibility of the corporation extended, beyond its shareholders, " to the commercial community, whose confidence and trade the plaintiff invited ", and that, as its charter " created a private trading body having in view pecuniary gains and advantages," there were duties owing to the public, who might become dealers therewith. The principle of estoppel *in pais* was applied in that case to negative the right of the company to deny the implied authority of its agent to do the acts occasioning the

injury and its application was determined by the consideration of the company's attitude and duties to the commercial community, whose confidence and dealings in the stock had been invited and facilitated.

This defendant, in no sense, occupies, or can occupy, the position towards the commercial community, which a railroad, or any other corporate body organized for purposes of commercial dealings, may. It is a membership corporation; which is to say, it is not a stock corporation, nor one organized for pecuniary profit, but is one for the more effective accomplishment of some object of mutual interest : in this case, the purchasing of property as a place for the burial of the dead, for the use of a number of individuals, or of their grantees, and the securing of a permanent management, through the instrumentality of trustees of their own appointment. (*Matter of Deansville Cem. Association,* 66 N. Y. at p. 573.) The defendant was organized as a cemetery association, in December, 1863, under chapter 133 of the Laws of 1847 and amendatory statutes. Under these statutes, such associations were permitted to enter into contracts with the owners of lands for their purchase and therein to agree to pay for the same by the appropriation of not exceeding one half of the proceeds of the future sale of lots. They provided that the residue of the proceeds were to be used for preserving, improving and embellishing the cemetery grounds and for incidental expenses. They authorized the association to issue corporate " certificates of indebtedness " to pay for the land, which were " to be deemed personal property " and to be " transferable by delivery." Twice in each year the trustees were to apply the proceeds of sales upon these certificates. It was, also, provided that " no other, or greater, liability shall thereby be imposed upon either Association, or trustees ", than was necessary to enforce the faithful application of the proceeds of sales to the redemption of the certificates. In this condition of the law, the defendant, in 1864, contracted with a number of landowners, who had conveyed lands to it for cemetery purposes ; whereby, among other things, it agreed to pay, as the purchase price thereof, " one-half the pro-

1909.] Am. Exch. Nat. Bank v. Woodlawn Cemetery. 123

N. Y. Rep.]        Opinion of the Court, per Gray, J.

ceeds of all sales of lots and plots made from the said lands ";
that "the said half of said proceeds should be divided into
12,500 equal shares "; that these shares should be distributed
among the vendors of the land in certain stated proportions, and
that "the half of said proceeds should be divided among the
shareholders in proportion to their several interests", quarter-
annually. Pursuant to this agreement, certificates of shares
were issued, in the form of the certificates in question in this
case. Subsequent legislation continued the restriction upon
the right of the association to apply in excess of one-half of
the proceeds of sales to the payment for lands and, at no
time, relieved it from the obligation of applying the residue
of the proceeds towards the improvement, etc., of the cemetery
grounds. In 1879, it may be noted, (Laws of 1879, chap.
107), it was provided that certificates of indebtedness *might
be changed* into certificates of stock, of a given tenor, and this
is the first statutory provision, relating to the issuance of stock
certificates. As to them, it was, further, provided that no
other, or greater, liability should be construed to have been
created by the issuance of such stock, "than may be necessary
to enforce the faithful application of the surplus, or net,
receipts of the Cemetery to and among the holders of said
stock in manner aforesaid." Permission to issue certificates
of indebtedness for lands purchased for cemetery purposes is
given in the general "Membership Corporation Act" of
1895, (Laws 1895, chap. 559), and provision was made for
regulating the issue and transfer of certificates of stock, there-
tofore issued in *conversion of an indebtedness, or of certifi-
cates of indebtedness*, and fixing the rights of holders to share
in the receipts. The limitation upon the creation of any
liability thereby was repeated, as hereinbefore quoted, and the
act concludes with the provision that "a cemetery, which has
heretofore issued such certificates of stock is a membership
corporation and not a stock corporation." The certificates
issued by the defendant were made to carry out its agreement
in the contract and there was never any change, or conver-
sion, into the certificates of stock, which later statutes author-

ized. It would appear, therefore, that neither statute, nor contract, conferred any power, or right, to issue " certificates of stock" and that the certificates, which were issued under the contract, can only be regarded as certificates of indebtedness, entitled to the application, at periodical intervals, of one-half of the proceeds of future sales of lots.

It thus appears from a consideration of the statutory provisions, which authorized the incorporation of cemetery associations and which regulated their functions and powers, that they might acquire lands for cemetery purposes; that they might fund their indebtedness for the consideration of the grant in certificates, which imposed a corporate obligation to apply thereupon half of the proceeds of sales, and that they must reserve the other half of the proceeds for cemetery purposes. It is evident that the legislative scheme was two-fold. It enabled such associations to acquire land and to provide for a future and conditional payment of the price, and it secured to the owners of burial plots the creation and the application of a fund for the perpetual preservation, improvement and embellishment of the grounds. In legal effect, the certificates issued by the defendant were promises to pay money; differing, essentially, from certificates of stock, which a stock corporation issues. As the payment was contingent and indefinite, and as the certificates were transferable only upon the books of the association, they were, of course, non-negotiable. It was not within the corporate powers of such associations to obligate themselves absolutely with respect to the proceeds of sales, or otherwise than by the certificates of indebtedness of the statute. They could not issue certificates of stock, as might stock corporations, for they had no capital stock. They were under restrictions, which entered into the fundamental law of their being. Authority to do acts, which might increase the corporate liabilities, could, alone, be conferred by the legislature of the state and the exercise of an unauthorized power on the part of their officers, honestly, or fraudulently, would be illegal and void. The powers of the corporation could not rise beyond the legislative source and the

wise scheme of the legislature, for a restriction of the corporate liability, by limiting what the corporation might do, and for the maintenance of a fund for the benefit of lot owners, could not be defeated by acts in excess of powers conferred. It is impossible for such corporations, of their own action, to enlarge their privileges and powers by assuming those of an ordinary stock corporation, whose object is the acquisition of profits for distribution among its members. The legislature, in conferring upon associations of that special character, special privileges and certain powers in aid thereof, must have intended to confine their corporate action within their bounds. Unlike the members of railroad, banking, insurance, and other mercantile, or trading, companies, having a capital, invested and managed for purposes of gain, the members of a cemetery association have no such proprietary interest and they derive no advantage from its operations; for what moneys are received from sales of plots are reserved, beyond incidental expenses, either to discharge its indebtedness, or to preserve and to improve the cemetery grounds. The question of the liabilities, which such associations may incur, is a very serious one and concerns the body of lot owners, for whose protection the legislative scheme was devised, and where a questionable corporate liability is predicated of acts of their officers, the inquiry must be into the extent of corporate powers, as found in the statutes; of whose provisions knowledge is chargeable to all who come into relations with the corporation. Whatever the rules laid down with respect to the business of stock corporations and to dealings by the public in their shares, as, for example, in the *Schuyler Case,* (*supra*), and cases founded upon the doctrine there announced, I, think that a different principle affects the decision of cases, in which a liability is sought to be imposed upon an association of the nature of the defendant for the unlawful, or wrongful, acts of its officers. In the *Schuyler* case, the company was held to be responsible for the injury caused to others by the acts of its agent, in issuing and transferring spurious certificates of stock, upon the same principle that would have made it liable, if such acts had

been those of the corporation. Incapacity to create spurious stock would have been no defense to an action for the damage caused. But it must be observed that, in that case, the certificates of stock were such as the company might issue. If the company, to subserve any of its business operations, had put upon the market a new issue of stock, it would have been through the agency of Schuyler. But, in the present case, there was no statutory authority to issue certificates of stock at all and the certificates, which were issued, had nothing of the nature of stock certificates. It was in the nature of the stock certificates, which stock corporations, like the railroad company in the *Schuyler* case, issue, and in the negotiable character, exceptionally, given them, in order to encourage public dealings in them, that the court founded the principle of liability. Such corporations were regarded as seeking to promote the enhancement of the monetary value of their capital stock, by entering it upon the market and by inviting the confidence and trade of the commercial community · through facilities of transfer. The common-law rule as to the non-assignability of choses in action became relaxed under the law merchant and, in the furtherance of the interests of commerce, commercial paper was given negotiability. This arbitrary rule of the law merchant was then extended to certificates of stock of stock corporations, in such wise as to invest them with a quasi-negotiable character; to use what is, perhaps, an inexact, but expressive, term. While they are neither in form, or character, negotiable paper, it is because they approximate to it, as well as because they have become the basis of commercial transactions and are sold in open market, the same as other securities, that they are accorded a negotiability like to that of commercial paper. The nature and extent of the dealings in them, in which they are passed from hand to hand like negotiable paper and in so many ways enter into the basis of credit, have influenced courts to accord to them the character of negotiability in order to meet a commercial need of the day. (See *Leitch* v. *Wells*, 48 N. Y. 585, 613; *Fifth Ave. Bank* v. *42d St. & G. St. F. R. R. Co.*, 137

ib. 231, 238 ; *Knox* v. *Eden Musee Am. Co.*, 148 ib. 441, 454 ; *Bank* v. *Lanier*, 11 Wall. [U. S.] 369, 377.) The substance of the rule of commercial negotiability, which is extended under the law merchant to instruments, which usage, or legislation, has brought within it, is that the possessor of such an instrument has power to give, by delivery to a *bona fide* purchaser for value, a good title, notwithstanding any defectiveness in his own. In extending the rule to certificates of stock corporations, there was reason ; for it subserved a business demand. They represent the distinct interests of the holders in the whole of the corporate property ; in the capital and in the net business earnings from operations, and the shareholders, as virtual proprietors of the corporate assets, hold and deal in them as articles of trade, whose attractiveness, or value, depends upon the trading advantages and profits of the company and the facilities for the transfer of the shares.

With what reason shall we regard the instruments issued by this defendant in the same light, as we do the stock certificates of a stock corporation, or withdraw them from the operation of the rule governing dealings in non-negotiable securities? In a sense, only, is a cemetery association a business corporation. It is concerned with the management of the temporal affairs of the associated members and in the adjustment of their relations to third persons and as between themselves. It is not engaged in commerce ; nor has it any capital with which to enter upon the commercial markets. There is not one substantial feature of resemblance with corporations organized for the pecuniary profit of its members and if, as seems to have been the fact, the certificates of the defendant had a market value, it is impossible to conceive of any misunderstanding, on the part of dealers, of the defendant's non-commercial nature and of the limitations upon its powers and activities. In providing for the issuance of certificates of a certain nature and for a certain purpose, the statute, impliedly, prohibited such an association from issuing any others and, as has been shown, these certificates are, in legal effect, but non-negotiable promises to pay money, whatever their disguise

in form, which an assignee takes with no better rights than were possessed by the assignor. They do not differ, in their negotiable character, from the certificate of deposit in *Zander* v. *N. Y. Security & Trust Co.*, (178 N. Y. 208), which was payable to the plaintiff, or her assigns. If there is any difference, it consists in the form and is not of substance. In that case, the certificate of deposit, upon which the plaintiff founded the action, had been lost and the defense of the company was that it was a negotiable instrument, or that, if not negotiable, its amount was made payable upon its return, and that it would be liable to third persons, acquiring it for value, in analogy to the law relating to certificates of stock. Judge CULLEN, speaking for the court, pointed out that the claim of negotiability was defeated by the provision, which made the certificate assignable, only, on the books of the company, and, with respect to the other defense, that it lacked analogy to a stock certificate and that " the two instruments differ entirely in character." It is of no importance that these certificates are promises to pay money, which may endure for the corporate life. That feature goes to their negotiability and brings them no nearer to the marketable stock certificates, in that respect. The same reasons do not exist for giving currency to these certificates of membership corporations, which cannot have a capital stock in circulation. Their limited powers and functions were calculated to prevent their coming under an increase of liability, over that which was statutory, or incidental, or under the hazards, which are made possible in the life of a stock corporation from the nature of its relations to and dealings with the commercial community.

The contention that the power existed to issue these certificates of shares, in a proper case, and that the corporation is liable for the misconduct of its agents, in issuing them in an improper case, is an effort to apply the rule of agency and, in that way, to evade the legal consequences affecting the possession by an assignee of a non-negotiable instrument. It is true that a principal is liable for the act of an agent, when it is, apparently, if not actually, within the scope of his agency ;

but I am unable to perceive how that rule applies to the transaction in this case. Knevals had fraudulently filled out in his name blank certificates, which had been confided to him, and had assigned them as security for a loan. There was neither a purported issue, nor a transfer, of shares to the plaintiff by the defendant and the latter was not brought into, nor was concerned with, the transaction. That excessive confidence in Knevals permitted him to embezzle and to make use of the certificates is true; but how can that fact alter the nature of the transaction with the plaintiff, wherein they were accepted as security for a loan? The plaintiff took them, as any other non-negotiable security, subject to all the equities against their assignor. If the rule in the *Schuyler* case is inapplicable, because of the radical differences in the nature of the corporations and of their certificates, for reasons which I have endeavored to point out, the assignment of these certificates put the plaintiff upon its inquiry as to every fact essential to their validity as obligations of the defendant. In our consideration of the plaintiff's case, we are, always, brought back to the character of these instruments and it makes no difference, legally, that they were expressed in a form calculated to confer the negotiability of stock certificates. The defendant could not change their real character as instruments for the payment of money; for that was its chartered limitation. If negligence is predicable of the defendant, it rendered it no more liable for the fraudulent use by Knevals of the certificates intrusted to his custody, than did the negligence of the defendant in the case of *Knox* v. *Eden Musee Am. Co.*, (148 N. Y. 441, 458).

My consideration of this case has led me to these conclusions: that these certificates were, in law and in fact, but promises to pay money; that they were, necessarily, from their tenor, as from the conditions under which payments were to be made, non-negotiable; that the plaintiff was chargeable with notice of the statutory restrictions upon the powers of the corporation and of its incapacity to issue anything under its contract except certificates of indebtedness;

9

that the principle of estoppel, within the rule in the *Schuyler* case, is inapplicable; that the plaintiff took the certificates from its assignor, Knevals, with no other rights against the defendant than he possessed, and that, consequently, it has no cause of action against the defendant.

I advise the reversal of this judgment and that a new trial be ordered; with costs to abide the event.

CULLEN, Ch. J., HAIGHT, WERNER, WILLARD BARTLETT and CHASE, JJ., concur; HISCOCK, J., dissents.

Judgment reversed, etc.