(65 Misc. Rep. 103.)

BASSETT v. PERKINS et al.

(Supreme Court, Trial Term, Erie County. October, 1909.)

1. BROKERS (§ 99*)—SALE OF STOCK—PERSONAL LIABILITY ON GUARANTY AS TO ASSIGNMENT—UNDISCLOSED AGENCY.

Plaintiff inquired of brokers engaged in buying and selling stock as to whether they had a particular stock for sale, and they said they had authority to sell some at not less than a specified sum. Plaintiff declined to pay them a commission for buying the stock, and they in fact received a commission from defendants, another firm of brokers, who sold the same, and who indorsed on the certificate a guaranty of genuineness of the signatures to the assignment. Held, that plaintiff was not chargeable with notice to the brokers through whom he bought that defendants were acting in the transaction for a disclosed principal, and the fact that plaintiff may have believed or supposed defendants were acting as agents for an unnamed principal would not relieve them from personal liability.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 140, 141; Dec. Dig. § 99.*]

2. PRINCIPAL AND AGENT (§ 136*)—PERSONAL LIABILITY OF AGENT CONTRACTING IN HIS OWN NAME.

Though an agent discloses the name of his principal, he may incur a personal liability by contracting in his own name.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 476–479; Dec. Dig. § 136.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. BROKERS (§ 95*)—SALE OF STOCK—PERSONAL LIABILITY ON WARRANTY AS TO ASSIGNMENT.

A stockbroker, by indorsing on a certificate a warranty of genuineness of signatures to a blank assignment indorsed thereon, is personally liable.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 137; Dec. Dig. § 95.*]

4. CORPORATIONS (§ 120*)—SALE OF STOCK—LIABILITY ON GUARANTY AS TO ASSIGNMENT.

That brokers, who sold stock for another firm of brokers, who warranted the genuineness of signatures to the assignment, indorsed their firm name on the certificate at the buyer's request, is of no consequence as respects seller's liability on the warranty.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 495; Dec. Dig. § 120.*]

5. CORPORATIONS (§ 120*)—SALE OF STOCK—WARRANTY OF SIGNATURES TO ASSIGNMENT.

A warranty by the seller of the genuineness of signatures to a blank assignment of stock does not lose its efficacy on a transfer of the certificate by the buyer.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 495; Dec. Dig. § 120.*]

6. CORPORATIONS (§ 112*)—NATURE OF STOCK CERTIFICATES.

Certificates of stock are in the nature of negotiable paper.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 464; Dec. Dig. § 112.*]

7. GUARANTY (§ 32*) — OF NONNEGOTIABLE INSTRUMENT AS PASSING TO ASSIGNEE.

A guaranty of a nonnegotiable instrument will pass to the assignee, though such guaranty is not in terms transferred.

[Ed. Note.—For other cases, see Guaranty, Cent. Dig. § 35; Dec. Dig. § 32.*]

8. CORPORATIONS (§ 120*)—SALE OF STOCK—NATURE OF WARRANTY AS TO ASSIGNMENT.

A warranty by brokers, indorsed on a certificate of stock sold by them, of the genuineness of signatures to a blank assignment of the certificate, is not a special, but a general, continuing warranty.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 495; Dec. Dig. § 120.*]

9. BROKERS (§ 95*)—SALE OF STOCK—PERSONAL LIABILITY ON GUARANTY AS TO ASSIGNMENT.

The rule that, where one of two innocent persons must suffer for the act of a third, he that employs and puts trust and confidence in the wrongdoer should be the loser, may be invoked against brokers selling stock and guaranteeing signatures to a blank assignment of the certificate, which signatures were in fact forged without their knowledge.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 137; Dec. Dig. § 95.*]

Action by George B. Bassett against Erickson. Perkins and another on a guaranty of the genuineness of signatures to an assignment of a certificate of corporate stock bought by plaintiff. Judgment for plaintiff.

Romer & Harrington, for plaintiff.
Joseph G. Dudley, for defendants.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

MARCUS, J. The defendants are copartners under the name of Spader & Perkins, engaged in the stock and bond brokerage business, having an office in Ellicott Square Building in this city. The Commonwealth Trust Company is a domestic corporation. It appears that on or about the 6th day of July, 1903, 10 shares of the capital stock of said Trust Company, of the par value of $100 each, were issued to Mrs. Fannie M. Eaton, and that she has at all times been the lawful owner and holder of said shares of capital stock, which are represented by certificate No. 50. This certificate she paid for by check to the order of the Commonwealth Trust Company, and after receiving the same placed it in her safe deposit box in the vault of the Marine National Bank. From that time until on or about September 3, 1908, when one of the attorneys for the plaintiff showed this stock to her at her home in the village of Lancaster, she had never seen it. The name of Mrs. Fannie M. Eaton, the holder of the stock, was forged on the back of the same under an assignment in blank, as was likewise the name of an alleged witness, Anna Hahn. Both pretended signatures are forgeries, and no person was ever authorized to assign, transfer, or indorse for Mrs. Eaton. It further appears that in the summer of 1907 Lewis Eaton called at the office of the defendants with the certificate of stock in question, with an apparent assignment on the back of the same; the assignment running to blank. Spader & Perkins thereupon guaranteed the signature in words following: "Signatures guaranteed. Spader & Perkins"—and sent it to New York to their correspondents, after which it was subsequently returned to Spader & Perkins, but simply with an additional power of attorney filled out that first appears below the pretended assignment. The defendants then stamped another power of attorney on the back of the certificate, signed it "Spader & Perkins," and handed it back to Lewis Eaton on or about October 19, 1907. Some time afterwards Lewis Eaton ordered the defendants to sell this stock. Meadows, Williams & Co. sent their check to Spader & Perkins on the purchase of same for $1,608.55, and Spader & Perkins gave Lewis Eaton a check for $1,500, retaining the balance by placing to the account of Lewis Eaton the sum of $105, and retaining $3.55 for their commissions. It therefore becomes apparent that Lewis Eaton retained Spader & Perkins a second time to sell this stock, and that Meadows, Williams & Co. sold this stock for Spader & Perkins and charged a commission for selling and deducted the same from the remittance; that Spader & Perkins negotiated the stock anew, leaving their guaranty indorsed upon the same under the assigment running to blank—i. e., to bearer; that Spader & Perkins, either then or prior thereto, caused their power of attorney to be stamped upon the certificate, and that they failed to strike off their guaranty from the back of the instrument; that Spader & Perkins warranted the genuineness of the signatures without knowing they were genuine.

Plaintiff testifies that he asked Steele, the representative of Meadows, Williams & Co., if he had any of this Trust Company stock for sale, and he said that he had 10 shares; that they did not have it there; they had an option on it—had it for sale. Steele asked 170 for it, and said he was not authorized to sell it for less. Plaintiff said that he did not feel like paying any more than the "book value," viz., $1,625.60.

Steele then said: "You make an offer of that amount, and I will see what I can do." Thereupon Steele communicated with defendants, to ascertain whether the stock could be obtained for that price, and in a few days he informed plaintiff that he could have the stock at the price offered. From the fact that Meadows, Williams & Co. were stockbrokers, and charged and were allowed by defendants a commission for selling the stock, it may properly be inferred that Steele informed them that they had a "customer" for the stock, and that it was not intended or understood that Meadows, Williams & Co. were purchasing for themselves to sell to another. Then Moyer, defendant's representative, goes with Eaton to the office of Meadows, Williams & Co. for the purpose of closing the transaction, taking the certificate with them. Plaintiff says he was present. Moyer says he was not. Moyer says he introduced Eaton to Steele, but not, of course, to plaintiff, as he was not present. Plaintiff says that Moyer came in with another man; but this man was not introduced to him, nor was he aware of his name. There the plaintiff's testimony confirms that of Moyer—that he was accompanied by another man; but this, according to Moyer, the plaintiff could not know, as he was not present. If plaintiff's testimony be true, it is rather strange that Eaton, the supposed owner of the stock, should be introduced to Steele, and not to the plaintiff, the proposed purchaser. However, it is of no consequence or importance whether plaintiff was present or not. The certificate was delivered over to Steele, plaintiff paid the amount of the purchase price to Meadows, Williams & Co. by draft, and the latter gave their check to defendants for the same, less the amount of commission charged.

Steele charged plaintiff a commission for buying the stock for him; but, when "I told him it was wrong," he struck it out at plaintiff's request. This circumstance would seem to indicate that plaintiff supposed or believed that Steele was acting in the transaction for the owner of the stock, from whom he would receive a commission, since he had stated that he was "authorized to sell it," and therefore the plaintiff thought it was wrong to charge him a commission on the purchase. Meadows, Williams & Co. were engaged in the business of selling, as well as of buying, stocks and other securities, and plaintiff went to them to ascertain whether they had any of this stock for sale, and they said they had, that they had authority to sell at not less than a specified sum. Under such circumstances plaintiff declined to pay a commission for buying that which they were authorized to sell, and they did in fact receive a commission from the vendor of the stock. If this be the correct view of the transaction, and we believe it is, then, of course, the plaintiff is not chargeable with notice to Meadows, Williams & Co. that defendants were simply acting for a disclosed principal, Eaton. And the fact that plaintiff may have believed or supposed that defendants were acting in the transaction as agents for an unnamed principal would not relieve them from personal liability. De Remer v. Brown, 165 N. Y. 419, 59 N. E. 129; McClure v. Cent. T. Co., 165 N. Y. 128, 58 N. E. 777, 53 L. R. A. 153; Holt v. Ross, 54 N. Y. 475, 13 Am. Rep. 615; Meriden N. Bank v. Gallaudet, 120 N. Y. 298, 24 N. E. 994.

And though the agent does disclose the name of his principal, he may incur a personal liability by making the contract in his own name. In Dahlstrom v. Gemunder, 133 App. Div. 69, 117 N. Y. Supp. 576, both the principal and agent represented and warranted that a violin was a genuine Stradivarius, and it was held that the agent, as well as the principal, was personally liable upon the warranty; a fortiori, where the agent, a stockbroker, indorses upon a certificate a warranty of genuineness. The fact of his agency does not preclude him from giving a personal guaranty or warranty. It seems that parol evidence would not be admissible to prove that it was agreed or understood that defendants should not be personally liable on the warranty of genuineness, but, that it was to be taken and accepted as the act of the principal, by them as agents. Auburn Bank v. Leonard, 40 Barb. 119, affirmed; Babbett v. Young, 51 N. Y. 242; 51 Barb. 466; Briggs v. Parker, 64 N. Y. 363, 21 Am. Rep. 617.

However that may be, no such evidence was offered or given by the defendants. The certificate was delivered with their personal warranty indorsed upon it, and nothing was said or done to impair its efficacy. Eaton's name nowhere appeared upon the paper, except as a witness. From the indorsements upon the instrument it appears that Spader & Perkins and Marshall, Spader & Co. were dealing with this certificate as owners or pledgees. No one else appears to have had any interest in or concern with it. Upon the faith and strength of the warranty of genuineness, plaintiff parted with his money; and, if the testimony of plaintiff and Harrington be accepted as true, the defendants acknowledged it to be their obligation and promised to "make it good." The warranty of a reputable firm of stockbrokers, like Spader & Perkins, connected as they were with the firm of Marshall, Spader & Co. in business dealings, and whose names also appear upon the certificate, was no doubt of considerable value in the "market." They assured plaintiff in most positive terms that the signature of Fannie M. Eaton was her genuine signature, and, as matter of course, he relied upon the assurance. They cannot be permitted now to say that they did not intend to make any such warranty to the plaintiff; for, by their acts and conduct, they are clearly estopped from denying or disputing it. In Worthington v. Cowles, 112 Mass. 30, the court said:

---

[9] "It may be true that defendants were agents for Hanson, and known to be such by plaintiff, and yet if, in the purchase of this note, it was understood that plaintiff was dealing with and upon the credit of defendants, they would be liable. An agent may so deal as to bind himself personally. It is always a question of intention and understanding of the parties. The judge ruled in substance that the question was: From whom did the plaintiff understand that he was buying the note—from the brokers or from Hanson? And that if such a state of facts occurred, that the plaintiff understood, or ought to have understood as a man of reasonable intelligence, that he was dealing with Hanson, the defendant would not be liable. These instructions were correct as applied to the facts of the case. The plaintiff dealt with defendants. His evidence tended to show that he contracted with them as principals. To meet this prima facie the defendants undertook to show that in this transaction they were dealing as agents of a disclosed principal. Unless from their disclosures or other sources the plaintiff understood, or ought as a reasonable man to have understood, that he was dealing with Hanson, he had a right to assume that he was dealing with defendants as principals."

In Wilder v. Cowles, 100 Mass. 487, 491, the court said that, if defendant made an express warranty of the genuineness of the note, he might be held, notwithstanding he disclosed his agency for Lane, if, from the form and manner of the warranty, it should appear that such was the intention. And to that effect is Argersinger v. Mac-Naughton, 114 N. Y. 535, 21 N. E. 1022, 11 Am. St. Rep. 687.

Evidently, the personal warranty of Spader & Perkins was of more value or importance than that of Eaton would be. The fact that Meadows, Williams & Co. simply indorsed their firm name upon the certificate at plaintiff's request is of no consequence whatever, since the warranty made at the time of transfer could not be affected or impaired by a circumstance of that character. That plaintiff purchased this certificate upon the faith and credit of the defendants' warranty is too plain to be disputed. Assuming, as it is contended, that the certificate was sold and transferred to Meadows, Williams & Co., personally, and that they themselves sold it to plaintiff, still the defendants would be liable to plaintiff, and to every subsequent purchaser. In other words, the warranty would not lose its efficacy after the first purchaser transferred the certificate, but would continue in full force and operation.

The nature and extent of the dealings in such certificates, in which they are passed from hand to hand like negotiable paper and in so many ways enter into the basis of credit, have influenced courts to accord to them the character of negotiability in order to meet a commercial need. American Exch. Nat. Bank v. Woodlawn Cemetery, 194 N. Y. 126, 87 N. E. 107; 1 Dos Passos, Stockbrokers, 705. A guaranty of a nonnegotiable instrument—e. g., a bond and mortgage—will pass to the assignee, although such guaranty is not in terms transferred. Craig v. Parkis, 40 N. Y. 181, 100 Am. Dec. 469; Stillman v. Northrup, 109 N. Y. 473, 17 N. E. 379. The defendants' warranty was not a special, but a general, continuing guaranty. Everson v. Gere, 122 N. Y. 292, 293, 25 N. E. 492.

The defendants naturally expected that the stockbrokers, Meadows, Williams & Co., would in the course of time sell or pledge this certificate with the warranty indorsed upon it, and that a purchaser would rely upon its truth and validity, as defendants intended and expected he should. In Royal Exchange Insurance Company v. Moore the plaintiff authorized S., a stockbroker, to purchase for them certain debentures. S. bought them of the defendants, who were also stockbrokers, and S. knew that they were dealing, not on their own account, but for an unknown principal. Defendants, however, gave a sold note, signed with their own name. They were, however, acting in the transaction for one A., who subsequently delivered to them a deed of transfer of the debentures, which was forged. This in time was delivered to S., who handed it to plaintiffs; and the latter was afterwards compelled to deliver it to the true owner by virtue of a decree of court. Held, that defendants were liable to plaintiffs on the ground that they had signed the sales note and were concluded thereby. 8 Law Times (N. S.) 242, 11 Weekly Rep. 592, quoted in 1 Dos Passos, Stockbrokers, 267; 2 Dos Passos, Stockbrokers, 763; 1 Cook, Stockholders,

§ 454. A broker is personally liable to the purchaser of worthless bonds, where he does not disclose his principal. Pugh v. Moore, 44 La. Ann. 209, 10 South. 710; 2 Dos Passos, 760. And where a broker received, in the course of trade, a transfer in blank of stock which had in fact been stolen and sold, held, that he was liable to the true owner for its value. 1 Dos Passos, 707, citing Bercich v. Marye, 9 Nev. 312; Swim v. Wilson, 9 Bkg. & L. J. 286, with article on "Stockbrokers' Liabilities" in such cases. And see Bangor, etc., Co. v. Robinson (C. C.) 52 Fed. 520.

In any view that may be taken of the case, the defendants cannot escape or be relieved from the legal consequences of their acts or conduct in the transaction. Further, the rule may here he invoked that, where one of two innocent persons must suffer for the act of a third, he that employs and puts trust and confidence in the wrongdoer should be the loser, rather than a stranger. Henry v. Allen, 151 N. Y. 1, 15, 45 N. E. 355, 36 L. R. A. 658; Knox v. Eden Musee Co., 148 N. Y. 441, 42 N. E. 988, 31 L. R. A. 779, 51 Am. St. Rep. 700.

If it is a hardship for the defendants to lose their money, so it is a hardship to the plaintiff.