COMMISSIONER OF INTERNAL REVE-
NUE v. KENSICO CEMETERY.
No. 201.

Circuit Court of Appeals, Second Circuit.
May 2, 1938.

James W. Morris, Asst. Atty. Gen., J.
Louis Monarch, Louise Foster, Sp. Assts.
to the Atty. Gen., for petitioner.

Gustavus T. Kirby, of New York City,
and Lawrence A. Baker, John A. Selby,
and Henry Ravenel, all of Washington,
D. C. (Henry R. Barrett, Jr., of White
Plains, N. Y., and Baker, Selby & Ravenel,
of Washington, D. C., of counsel), for
respondent.

Schuyler M. Meyer, of New York City
(H. Maynard Kidder and Charles C. Stov-
er, Jr., both of New York City, of coun-
sel), amici curiæ.

Before MANTON, AUGUSTUS N.
HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

The question presented by this petition
is whether the respondent, a New York
membership corporation, was exempt from
income tax during the period from 1926
through 1932 by reason of section 231(5)
of the Revenue Act of 1926, 44 Stat. 9,
39, 26 U.S.C.A. § 103(5) and note, and sec-
tion 103(5) of the Revenue Acts of 1928
and 1932, 45 Stat. 791, 812, 47 Stat. 169, 193,
26 U.S.C.A. § 103(5) and note. In identical
language, these acts exempt "cemetery
companies owned and operated exclusively
for the benefit of their members or which
are not operated for profit; and any cor-
poration chartered solely for burial pur-.
poses as a cemetery corporation and not
permitted by its charter to engage in any

business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

Land was acquired by respondent for burial grounds pursuant to the New York Statute, Laws of 1853, c. 122, § 1, which permits a cemetery to purchase land for burial purposes under an agreement to pay as the purchase price instead of a fixed sum "any specified share or portion not exceeding one-half the proceeds of all sales of lots or plots made from such lands."

In 1889 respondent was organized as a rural cemetery association under chapter 133 of the Laws of 1847 as amended. It had no paid in capital and issued no certificates except those referred to herein. Since its organization and during the taxable years here in question, its business has consisted exclusively of the sale of lots for burial purposes or other activities normally incident thereto. After incorporation, respondent purchased 250 acres of land for cemetery purposes and agreed to pay as the purchase price thereof one-half of the proceeds of all sales of lots made from this land. The interest of the vendors was divided into 12,500 shares and land share certificates were issued by the respondent in payment therefor. It was provided that the certificates should be transferable on the books of the association in like manner as shares of stock.

Under this agreement, the land shareholders received $375,000 up to December 31, 1905, as their share of the proceeds from the sale of lots and plots. During this period, respondent paid out $926,000 for improvements of the cemetery; of this sum $353,000 represented borrowed money and a part of this was covered by certificates of indebtedness issued under the authority of section 97, chapter 74 of the Cemetery Act.

In 1906 respondent purchased an additional 333 acres from another vendor. Part of this new land was held by the Kensington Cemetery, of which the vendor held 90 per cent. of the outstanding land share certificates. As part of the plan, all of the outstanding land share certificates of the Kensington and Kensico Cemeteries were to be exchanged for a new series of land share certificates. This plan provided that the rights of one-half of the lot sales should be divided into 30,000 land shares and that the certificates for such shares were to be applied in the first instance so that the prior rights of the existing certificate holders of Kensico and Kensington Cemeteries should be recognized. In doing this, 12,500 new shares were reserved for Kensico's outstanding certificates; 5,000 land shares were allotted to the vendor of the second parcel but out of these, reservations were made for any land shares of Kensington which were not turned in. The remaining 12,500 land shares were to be offered for sale by respondent. However, the proceeds from the sale were to be used to retire certain mortgages which respondent had assumed as part of the transfer and to retire certain certificates of indebtedness held by the vendor of the second parcel and others; the remaining money, if any, was to be used for specified improvements in the cemetery.

From 1889 to 1925 respondent received for the sale of lots and plots the sum of $3,542,047.13, of which $1,179,239.15 was paid to land share holders. There was a surplus shown made up of its share of the sale of lots and revenues from its incidental cemetery operations.

The petitioner contends that the association was organized as a business enterprise conducted with a view of making profits and that the revenues were being used in part toward maintaining a business organization to promote the sale of lots; that large sums of money were used to embellish the cemetery, causing lot prices to go up and thus to create more profit to the land share holders and that consequently the operation of the association has been as much for the benefit of the land share holders as for the members and it is not exempt under the statute from payment of income tax.

Agreements for the purchase of land as here disclosed were expressly authorized by the Legislature of New York. This originated not in any plan for private enrichment, but in a public movement which was common to Great Britain and the United States in the early nineteenth century to correct unhealthful practices of sepulchers in crowded cities.[1]

As early as 1847, the New York Rural Cemetery Act authorized the acquisition of burial grounds under agreement to apply a fixed proportion of the proceeds of

---

[1] See Universal Cyclopedia & Atlas, N.Y. 1908, Title: Cemetery.

the sale of lots made from such lands as payment of a definite purchase price. Laws of 1847, c. 133, § 7. The Legislature in 1853 extended section 7 and authorized an alternative method of acquiring burial lands by payment not to exceed one-half of the proceeds of the sale of lots, without limit, as the purchase price. Laws of 1853, c. 122, § 1. This provision has remained substantially unchanged in the successive revisions of cemetery statutes. N.Y.Membership Corporations Law of 1895, Laws 1895, c. 559, § 50; Consol.Laws of 1909, c. 35, Laws 1909, c. 40, § 70; Laws of 1926, c. 722, § 87. Moreover, section 2 of the Membership Corporations Law of New York provides that a corporation existing under such law must be one not organized for pecuniary profit.

The land purchase agreements involved herein do not contain any evidence of an interest in the net earnings of the cemetery but of an indebtedness altogether independent of the question of "net earnings." By these agreements, the land share holders have no direct interest in the business. The certificates can "only be regarded as certificates of indebtedness, entitled to the application, at periodic intervals, of one-half of the proceeds of future sales of lots" and they are "promises to pay money, differing essentially from certificates of stock which a stock corporation issues." American Exchange Nat. Bank v. Woodlawn Cemetery, 194 N.Y. 116, 87 N.E. 107, 110; Gregory v. Chapman, 119 Md. 495, 87 A. 523.

The respondent is a membership corporation, that is to say, not a stock corporation nor one organized for pecuniary profit. It exists in accordance with legislation designed to meet a public purpose. Its revenues, derived from the sale of burial plots and incidental services, are directed in their entirety to the payment of debts incurred in the acquisition of burial grounds and in the maintenance and improvement of the cemetery for the public end for which the corporation was organized.

■ There are three statutory requisites for exemption and these are mutually independent. The presence of any of them creates an exemption. Companies are exempt which are owned and operated exclusively for the benefit of their members, or which are not operated for profit, and any corporation chartered solely for burial purposes, as a cemetery corporation and not permitted by its charter to engage in business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual. Payment of the purchase price of its land out of a proportion of the proceeds of the sales does not bring that payment within the statutory prohibition. If there are no sales, there is no payment due to the land certificate holder.

■ The exemption provision of the statute may not be construed to classify creditors whose debts are paid, as private shareholders or individuals to whose benefit the net income of the corporation inures. Exempt charities and churches are frequently indebted on real estate mortgages and some form of security is issued therefor. The rights and obligations of such certificate holders are fixed by the agreement and are in no way dependent upon net earnings.

Payment on the certificate may or may not constitute net earnings to its holder, depending upon the cost of the security to him, but what is paid does not constitute net earnings from the corporation. Here the cemetery net earnings are arrived at only after the elimination of payments made on the certificates.

■ The argument that net earnings may be distributed not in cash but in intangible values as the improvement of the remaining lots (by the embellishment of the cemetery) is without merit. While the improvements might enhance the value of the unsold lots and increase the prices received therefor to the advantage of the land certificate holders, still, one of the purposes which justifies the exemption of a cemetery is such acquisition, improvement, and embellishment of burial grounds. The purchase certificate holders received what they were entitled to under the contract they made, which necessarily contemplated improvement of the cemetery lands. If payment of one-half of the proceeds of the lots sold did not affect the cemetery exemption before its improvement, it is difficult to see why it can do so afterward. Creditors are usually benefited by the employment of a debtor's net earnings in improvement of the corporate properties, but in no instance has that been held to deprive a corporation otherwise exempt, of its immunity. Here the cemetery's revenues resulted from and were devoted to the purposes for which the statute desires them to be exempt and this applies not only to revenues im-

mediately applied to maintenance and improvement of the burial grounds, but to the revenues accumulated for such purposes. The cemetery is devoted to a public purpose which the tax law aims to protect and it is not operated for profit. Trinidad v. Sagrada, 263 U.S. 578, 44 S. Ct. 204, 68 L.Ed. 458. The respondent is owned and operated exclusively for the benefit of its members and therefore is exempt.

Decision affirmed.