Howard Carleton Avery, Petitioner, v. Commissioner of
Internal Revenue, Respondent.

Docket No. 18334.   Promulgated September 23, 1949.

*John Todd Stuart, Esq.*, for the petitioner.
*Thomas R. Charshee, Esq.*, for the respondent.

#### OPINION.

Leech, *Judge*: This proceeding involves income tax for the calendar
year 1944 in the amount of $2,939.58.   Respondent claims an increased
deficiency of $417.48.   The sole contested issue is whether the amount
received by petitioner in the taxable year on certain certificates issued
by the Maple Grove Cemetery Association over the cost thereof is
taxable as ordinary income or long term capital gain.

The facts have been stipulated.   We adopt the stipulation as our
findings of fact.   Those facts material here are as follows:

Petitioner filed his income tax return for the taxable year with the
collector of internal revenue for the third district of New York.

Petitioner is the registered owner and holder of certificate No. 118
(129/1500 parts), dated March 4, 1938; No. 119 (14/1500 parts), dated
March 23, 1938; and No. 127 (114/1500 parts), dated July 21, 1941,
of the Maple Grove Cemetery Association.   The total of petitioner's
holdings of such certificates is 257/1500 parts.   All of these 257/1500
parts were acquired for a valuable consideration, the amount of which
is not in dispute, more than six months prior to January 1, 1944.   Dur-
ing the calendar year 1944, petitioner received from the Maple Grove
Cemetery Association $20,863.26 on account of his ownership of said
certificates, of which $7,224.15 was over and above the cost of the
certificates, reduced by amounts received by him in prior years.

The Maple Grove Cemetery Association is a rural cemetery asso-
ciation incorporated on or about February 4, 1875, pursuant to the
Rural Cemeteries Act of 1847 of the State of New York (now Member-
ship Corporations Law).   Since 1875, the association has operated
a cemetery for the burial of the dead at Kew Gardens, Queens County,
New York.   Part of such operation includes the sale to the public of
burial rights in lots and plots.   Pursuant to the statute and in accord-
ance with its bylaws, the association is directed by its duly elected
trustees and managed by its duly elected officers.

352

The association acquired approximately 75 acres of land at Kew Gardens, New York, from Mary A. Webb, by two deeds dated June 1 and July 26, 1875, respectively. These 75 acres of land then were and have at all times since been the only land of the association used for burial purposes.

The contract between the association and Mary A. Webb covering the acquisition of the 75 acres of land reads in part as follows:

*1st.* That the said lands or such parts thereof as may from time to time be required for the purpose, shall be surveyed and subdivided into lots or plots of suitable size for burial and ornamental purposes with such avenues, paths, alleys and walks as may be proper, and that when so surveyed and subdivided the said lots or plots shall be sold and conveyed by the party of the first part at the following prices or grades of prices viz: At not less than Twenty Cents per square foot.

*2nd.* That the party of the first part will pay to the party of the second part for the said lands as the purchase price thereof, one half the proceeds of all sales of lots and plots made from said lands.

*3rd.* That the said half of said proceeds shall at the election of the party of the second part be divided into *One Hundred and Fifty* equal parts, and one or more certificates at the like election of the party of the second part shall be issued to her or her assigns or legal representatives for the said parts, and the said parts shall be personal property and may be transferable by the party of the second part or her legal representatives upon the books of the party of the first part upon the surrender of the certificates the same as stock is usually transferable.

*4th.* That the said half of said proceeds shall be paid to the party of the second part or divided among the persons owning the said certificates in proportion to their several interests on the first days of *February, May, August* and *November* in each year, and shall be payable at the office of the party of the first part in the City of New York.

*5th.* That the party of the first part will faithfully appropriate the residue of the said proceeds not herein disposed of to preserving, improving and embellishing the lands above mentioned and the avenues or roads leading thereto and to defraying the incidental expenses of the cemetery establishment.

*6th.* That this agreement shall be binding upon the parties hereto and upon the successors of the party of the first part and the executors, administrators and assigns of the party of the second part, and upon all persons hereafter holding any of the certificates, whether parties hereto or not.

The certificate issued by the association reads in part as follows:

This Certifies that _____ is entitled to _____ Fifteen Hundredth parts of one half of the proceeds of all sales of Lots or Plots made by the Association from lands purchased from Mary A. Webb for Cemetery purposes, transferable only on the books of the Association by said _____ or _____ _____ Attorney on the surrender of this Certificate.

By mutual agreement made within one year after the acquisition of the land, the figure "150" was changed to "1500." The entire 1,500 parts of this certificate were issued; and in 1944 were outstanding, and

none has ever been acquired or was owned by the association at the time of the hearing of this proceeding.

The holders of land certificates do not vote for trustees or officers of the association, and their sole rights are those set forth in the aforesaid agreement.

The association has always kept a formal certificate book, in numbered form, showing the ownership of such certificate, or parts thereof, and transfers are made only therefrom. The holders of such parts receive a numbered certificate or certificates for the parts owned by them. The books of the association are kept on a cash basis, and one-half of the proceeds of sale of burial lots or plots for the preceding period is paid to the certificate holders of record at quarterly intervals. Payments to the holders of the certificates have been made since 1875 in varying amounts. The amount of available land unsold is capable of determination. For 1944 a fair estimate would be 40 per cent unsold, and presently 15 per cent unsold.

In his income tax return for the year 1944, petitioner reported a gain of $6,583.09 from the payments received from the association. It is agreed that the correct amount of gain is $7,224.15.

Petitioner contends that the certificates in question are certificates of indebtedness issued by a corporation in registered form and that section 117 (f) of the Internal Revenue Code [1] is applicable, so that the amounts received in 1944 are to be considered as received in exchange therefor, and hence are taxable as capital gains. The question of the taxability for income tax purposes of certificates issued by cemetery associations of the character of those involved here does not appear to have been reviewed by the courts previously. Certificates issued by cemetery associations under the New York statutes in form and substance similar to those in question have been construed by the Court of Appeals of the State of New York. In *American Exchange Nat. Bank* v. *Woodlawn Cemetery*, 194 N. Y. 116; 87 N. E. 107, the court described similar certificates as nonnegotiable certificates of indebtedness, and as promises to pay money differing essentially from certificates of stock. See also *Commissioner* v. *Kensico Cemetery*, 96 Fed. (2d) 594. The parties have, therefore, properly assumed that the certificates here involved are of the character described in section 117 (f) of the code.

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

*          *          *          *          *

(f) RETIREMENT OF BONDS, ETC.—For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor.

The respondent contends that there was no retirement of the certificates in 1944 within the meaning of section 117 (f), because petitioner still holds the certificates, which can be sold by him, payments on the certificates are vague, uncertain and indefinite, and no payments are due if there are no sales of cemetery lots.

In the case of *Edith K. Timken*, 6 T. C. 483, we considered the meaning of the term "retirement" as used in section 117 (f) in connection with payments made on "creditors notes," where the respondent advanced a similar argument to that made here. We there said:

\* \* \* The respondent's view that the payments here were not retirement means in effect that only the final payment on the notes, or a single payment of the full amount, can constitute retirement. We do not subscribe to such idea. Each payment on the note *pro tanto* retired it. We see nothing in the statute to justify a contrary conclusion. \* \* \*

We there held that the payments contributed to the retirement of the notes and that the amounts received were "to be considerd in exchange therefor," and taxable as capital gains. Cf. *William H. Noll*, 43 B. T. A. 496.

The respondent refers to no authorities in support of his position. He attempts to distinguish the *Noll* case, *supra*, on the ground that the obligations involved were in fixed amounts. Section 117 (f) of the code does not provide that the obligations must be for a fixed amount, nor does it prescribe any time limit on the retirement of the obligations mentioned therein. Each sale of a lot reduces *pro tanto* the source of payment on the certificates. It has been stipulated that only 15 percent of the available land remains unsold. When the last lot is sold, the certificates will *ipso facto* become worthless. Hence, each payment on the certificates is a partial retirement thereof. We conclude that the amounts here involved were received by petitioner upon "retirement" of such certificates of indebtedness, and are to "be considered as amounts received in exchange therefor." Hence the gains realized are taxable as capital gains.

Since it is stipulated that the actual gain realized by petitioner in the taxable year is in excess of the amount reported in his income tax return,

*Decision will be entered under Rule 50.*