SARAH GREGORY, ANTOINETTE GREGORY AND
JULIA G. FLYNN *vs.* JAMES W. CHAPMAN,
JR., REDMOND C. STEWART AND JAMES
E. INGRAM, RECEIVERS. REESE CAR-
PENTER, EXECUTOR OF THE WILL OF
CAROLINE CARPENTER, DECEASED,
*vs.* SAME. J. H. RHODES
*vs.* SAME.

*Liens: what constitutes—. Insolvency: creditors' rights; equi-
table distribution. Cemetery Companies: insolvent; lot-
holders' rights; rights of holders of "land certificates.".
Corporations: without capital; purchase of land;
"land certificates," in payment; rights
of holders.*

An interest amounts to a lien only where it is susceptible of
enforcement by the sale or appropriation of the property to
which it relates.                                    p. 503

A cemetery company, not authorized to issue any capital stock,
in order to pay for its land, issued obligations called "land
certificates," the holders of which were to receive one-half
of the proceeds of the sale of the use of lots for burial pur-
poses; upon the insolvency and dissolution of the corpora-
tion, and a sale of its assets by a receiver, it was *held,* that
such "land certificates" were not liens on the land, but were
at most only liens upon the proceeds of the sale, and did not
affect the title of the purchaser at the receiver's sale.  p. 503

This plan for the purchase of property by a corporation, which is not authorized to issue capital stock, is neither *ultra vires* nor illegal. p. 505

The holders of such certificates had no voting privileges, no say in the management of the company, and had no interest but to receive one-half of the proceeds of the sale of the use of lots; they were not stockholders of the company, but were vendors, with claims contingent both as to the amount and time of payment of the purchase money.

As the proceeds from the receiver's sales included not only the returns from the sale of the *use of burial lots,* referred to in the land certificates, but also from the sale of permanent and expensive improvements made by the company, to which the holders of the certificates had not contributed, the latter had no lien upon the whole of such proceeds; they were *held,* to be creditors only of the company and, as such, entitled to participate with the other claimants, but with no priority over them. pp. 506-507

They should be treated as creditors, with claims aggregating one-half of the proceeds from the sale of the cemetery and, in addition, one-half of the amounts realized by the company, and its receivers, from the sale of the use of burial lots, on account of which the certificate holders had received no payments; and upon the basis of the claims so ascertained, the certificate holders should share in proportion to their respective interests, *pro rata* with all other creditors.
p. 508

In the distribution of the assets of a corporation because of insolvency, the principles of equity must be applied. p. 508

Upon the insolvency, dissolution and sale of a cemetery company which had sold lots under an agreement for their perpetual care and maintenance, it is proper that a stipulation should be made for the assumption of this duty by the purchaser of the cemetery property. p. 509

*Decided January 17th, 1913.*

Four appeals from the Circuit Court for Baltimore County, sitting in Equity (DUNCAN, J.).

The facts are stated in the opinion of the Court.

The four appeals were argued before BOYD, C. J., BRIS-
COE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE,
JJ.

*Morris A. Soper* (with a brief by *Soper & Emory*), for
J. H. Rhodes, appellant.

*George M. Brady* (with *Maloy, Brady & Embert* and
*Burke & Janifer* on the brief), for F. E. Baker and Reese
Carpenter individually, appellants.

*Osborn I. Yellott* (with whom was *Richard E. Preece* and
*Arthur P. Gorman, Jr.,* on the brief), for Sarah Gregory
*et als.* and Reese Carpenter, executor, appellants.

*Randolph Barton, Jr.,* and *Edwin T. Dickerson* (with
whom was *W. Burns Trundel* on the brief), for the receiv-
ers, appellees.

*Joseph C. France* (with whom were *Alfred Bagby, Jr.,
Clarence W. Perkins, J. Edward Tyler* and *Wilton Snowden,
Jr.,* on the brief), for the holders of land shares.

URNER, J., delivered the opinion of the Court.

The Druid Ridge Cemetery of Baltimore County was in-
corporated on January 14th, 1896, under the general cor-
poration laws of Maryland. Its charter declared that it was
not organized for profit and that it would have no capital
stock. Upon the day of its incorporation it acquired by deed a
tract of 200 acres of land in Baltimore County. This was
in excess of the quantity of land it could hold under the law,
but the conveyance was subsequently sanctioned by the Act

of 1900, Chapter 537. There was no purchase price mentioned in the deed, but contemporaneously with its execution the parties entered into a written agreement in which the consideration was expressed. The agreement recited that the deed had been executed by Charles Tyler as owner and holder of the land for himself and his associates, whose interests were divided into ten thousand shares and were held in specified proportions, and it provides that the corporate grantee should pay to the holders of the shares thus defined, as the purchase price of the property conveyed, one-half of the proceeds of all sales of the use of lots in the cemetery for burial purposes. It was agreed that certificates for the shares should be issued by the corporation and be transferable on its books, and that the shareholder's half of the proceeds of the sale of lots should be divided among them according to their several interests on the first days of January and July in each year. It was further provided that the company should apply the remaining half of the proceeds of such sales to preserving, improving and embellishing the cemetery grounds and its avenues, paths and roads and to defraying its incidental expenses. There was a provision that the lots should be sold at prices to be established in the by-laws of the company, first adopted after the agreement, and should not be changed without the written consent of a majority in interest of the shareholders. This contract was entered upon the minutes of the corporation, and was recited in a later agreement between the parties, executed and acknowledged on March 23rd, 1897, and filed for record the following month with the deed, which had not previously been recorded. In the last mentioned agreement it was stated that the title conveyed by the deed was intended to be clear of an outstanding mortgage on the land for $25,000.00, which the grantor had proposed to pay from the proceeds of the sale of 1000 shares in the cemetery, and it was agreed, in lieu of this arrangement, that the corporation should assume the mortgage in consideration of the transfer of that number of shares to a designated person for the company's

use.  The transfer of the shares is admitted in the agree-
ment to have been made prior to its delivery, and the amount
they represented, estimated at $25,000.00, was invested in a
mausoleum erected in the cemetery at a total cost of $56,000.

On the day of the execution of the first agreement referred
to the company adopted by-laws which included a regula-
tion establishing the prices for the sale of burial lots.  Pro-
vision was also made for the issuance of certificates of in-
debtedness if the company should incur debts for services
rendered or material furnished in preserving or improving
the cemetery.  These certificates were to be transferable by
delivery, unless otherwise provided by their terms; and it
was made the duty of the trustees of the cemetery to set
aside from the proceeds of sales of the use of lots such sums
as they might deem necessary to pay the certificates at their
maturity.  The right to vote at the meetings of the corpora-
tion was conferred upon holders of certificates of indebted-
ness and owners of burial lots, but this privilege was not
given the holders of land share certificates.

The company began its operations without capital, and it
was required from the outset to contract debts and borrow
money in order to develop the land it had acquired and
make it available for cemetery purposes.  There was ex-
pended for roads and grading, the construction of an en-
trance building and a mausoleum, the making of a lake, the
erection of fences, and for other improvements, a total of
about $80,000.00.  In addition to this outlay the company
had to provide approximately fifteen thousand dollars a year
for operating and maintenance expenses.  The sales of lots
were not sufficiently rapid and numerous to produce the
funds necessary to meet these heavy demands, especially in
view of the appropriation of half the proceeds to the land
shareholders.  It was consequently necessary to gradually
increase the issues of indebtedness certificates.  They event-
ually aggregated $142,203.00 and represented practically
every class of expenditures made by the company, as they
were issued not only for improvements but also on account

of loans contracted to meet the current cost of operation, interest on existing debts, reduction of the mortgage, and in some instances, apparently, for shares due holders of land certificates. In 1910 the company owed, besides the certificates of indebtedness, and exclusive of interest, a balance of $15,197.00 on the mortgage, $25,000.00 on promissory notes, $900.00 on what the record describes as comptroller's notes, $13,569.60 on open accounts and $15,835.11 on land shares, making total liabilities of $212,704.71. Its assets, apart from the cemetery grounds and improvements, consisted of accounts receivable to the amount of $17,574.17 for lots sold, about $400.00 in cash, and some implements and other chattels whose value is not ascertained. At this period burial lots having an aggregate area of 11 acres had been sold for approximately $245,000.00, of which $100,000.00 had been distributed in semi-annual dividends to the holders of the land certificates, and the residue applied to improvements, current expenses and fixed charges. The amount required annually for these purposes was from $7,000.00 to $9,000.00 in excess of the company's available income, and after its operations had been conducted under these difficult conditions for fourteen years a proceeding, such as the present, for a receivership and dissolution on the ground of insolvency appeared to be unavoidable.

A bill having that object in view was filed in the Circuit Court for Baltimore County on October 15th, 1910. There were two plaintiffs in the proceeding, one of whom was a creditor upon an open account and promissory note, and the other a lot owner and holder of both land and indebtedness certificates. The company filed an answer admitting its insolvency and consenting to such action in the premises as the Court might deem proper. An order was thereupon passed appointing receivers. Shortly after entering upon their administration they filed a petition to have the holders of the land certificates made parties to the proceeding in order that their interests might be protected, and that the purchaser of the company's unsold land might acquire title

free of any claim based upon these obligations. The peti-
tion contained a list of the land shareholders, and the Court
ordered that they be made parties and notified by the usual
process. In the meantime, on application of the receivers,
the publication of a notice to creditors had been directed.
Numerous answers were filed by holders of land shares and
by claimants belonging to each of the other classes we have
described. There was a great divergence in the views pre-
sented as to the rights of the various respondents and as to
the proper disposition of the cemetery and the proceeds of
the land if decreed to be sold. After a full hearing the
learned Court below passed a decree dissolving the company
on the ground of insolvency and providing for the sale of
its property and franchises. The decree directed that the
sale be made subject to the outstanding mortgage and to the
proviso that the purchaser should covenant and agree to
hold and invest $40,000.00 of the purchase price as a fund
to meet and comply with all obligations theretofore assumed
by the cemetery company, or the receivers, for the perpetual
care of lots sold for burial purposes, and should further
covenant and agree to set apart, invest and hold such por-
tion of the proceeds of lots thereafter sold as might be
necessary to provide for their perpetual care and mainte-
nance. It was determined by the decree that out of the
money arising from the sale of the cemetery the expenses
of the receivership proceeding be first paid, that the sum of
$40,000.00 be invested in the name of the purchaser for the
purpose previously indicated, and that the residue of the
proceeds of sale be divided into two equal portions, one
of which should be distributed to the holders of land shares,
and the other applied, first to the payment in full of comp-
trollers' notes and open accounts, and next to the certificates
of indebtedness and promissory notes.

There is no appeal from this decree in so far as it adju-
dicates the insolvency of the company, effects its dissolution
and directs a sale of its property, but two holders of certifi-
cates of indebtedness have appealed from that portion of

the decree which prescribes the mode of distributing the proceeds of sale. Pending this appeal the receivers made and reported to the Court a sale of "all the unsold land and improvements, personal property, rights, privileges and franchises" of the Druid Ridge Cemetery Company, "as an entirety and as a going concern" for $205,000.00, subject to the mortgage for $15,197.00 and to the condition that the property be maintained as a cemetery, and that provision be made in the manner prescribed by the decree for the care of burial lots theretofore and thereafter sold. Exceptions to the sale were filed by holders of promissory notes and certificates of indebtedness, who questioned the adequacy of the price at which the property was sold, and asserted that the sale was not made advantageously in view of the pendency of an appeal from the decree determining the disposition of the proceeds. It was stated that parties interested in the fund would have bid at the sale if their rights had been finally and favorably adjudicated, but that they were precluded from doing so on account of uncertainty as to the result of the appeal. The purchaser also excepted to the sale in order to obtain the judgment of the Court as to the validity of his title. All the exceptions were overruled and the sale ratified, and from this action the exceptants have appealed. These latter appeals were brought up in a supplemental record and have been argued with the appeal taken from the decree under which the sale was reported.

The purchaser is the only party who raises in this Court any question as to the decree in so far as it directs the *sale* of the cemetery. While he is desirous of consummating the purchase, he is doubtful as to the title because of the fact, appearing of record, that some of the resident holders of land share certificates were not summoned in the proceeding. The point is made that such certificates, and the agreement under which they were issued, may have created a lien on the land, and that a decree for sale clear of such lien could not be affected unless all the lienors were duly

notified by summons as to the resident, and publication as to the non-resident parties. It is suggested further that the case does not show conditions which make it proper to apply the rule of representation as between the present and absent defendants.

In our opinion there is no difficulty as to the title. Whatever interest the land certificates represented in the proceeds of the sale of burial lots, it is clear that they constituted no lien upon the land out of which the lots were formed. The agreement which provides for these certificates is entirely incompatible with the existence of such a lien. It not only permits but requires the vendee to lay out and sell the land for burial purposes and expressly limits the vendors' claims to one-half of the proceeds of the sales as the measure and source of payment. An interest amounts to a lien only where it is susceptible of enforcement by the sale or appropriation of the property to which it relates. *Jordan v. Reynolds*, 105 Md. 294; *Eschbach v. Pitts*, 6 Md. 71; 25 *Cyc*. 660. In this case it is evident that such a right could not be exercised consistently with the contractual duty imposed upon the vendee company to *re-sell* the land. The decree of the Court below, therefore, did not disregard any interest which may disturb the title, and the purchaser's exception on this ground was properly overruled.

The other exceptions to the ratification of the sale are not supported by any evidence from which we can determine that the price obtained was inadequate or that it would have been greater if the sale had been deferred until after a decision of the appeal from the decree. If the order confirming the sale were to be reversed upon this objection, and the property required to be again offered for sale, we find no assurance in the record that any of the parties interested would bid a higher price than the one reported. Apparently the main purpose of these exceptions, and the resulting appeals, is to preserve and emphasize the objections raised by the earlier appeal as to the disposition by the decree of the proceeds of sale.

The most important of the contentions thus presented is that the decree was erroneous in its allowance to the land certificate holders of one-half the funds remaining after the payment of the expenses of the proceeding and the investment of $40,000.00 for the care of burial lots. It is insisted by the creditor appellants that their claims should have priority over the land shares. Their theory is that the land certificate holders are virtually the owners of the property and business of the company and that their rights should consequently be subordinated to those of the creditors. It is urged that the certificates issued by the company for the land shares are practically identical in form with ordinary certificates for shares of stock, that the holders received periodically as dividends a stated proportion of the proceeds of the company's sales, that as the balance of the funds derived from that source was required to be invested in the improvement of the land thereafter to be sold, the shareholders were necessarily the sole eventual beneficiaries of any profits realized from the company's operations, and that they accordingly are not entitled in equity to occupy any more favorable position than that of stockholders when the company's assets are insufficient for the payment of its debts. The further contention is made that since the charter of the corporation declared it was not formed for profit and should have no capital stock, the agreement providing for the issuance of shares equivalent to stock and for the conduct of the corporate enterprise in such a way as to produce substantial profits for the shareholders was beyond the powers of the corporation.

The objection last stated will be first considered. There is no restriction in the charter as to the method of procuring and paying for the land needed for the cemetery, and the general law under which the company was incorporated expressly gave it the right "to acquire by purchase or in any other manner, and take, receive, hold, use, employ, manage, dispose of, or in any manner not inconsistent with law, deal with any property * * * which may be necessary or

proper to enable said corporation to carry on the operations
or fulfill the purposes named in its certificate of incorpora-
tion." Code of 1888, Art. 23, sec. 53. The Cemetery Com-
pany was thus invested with very broad powers in reference
to the acquisition of the land it required, but as it had no
assets and was to have no capital stock it was without the
means to pay at once for the property proposed to be pur-
chased. It would therefore seem to have been not only
legitimate but necessary for the company to provide for the
payment of the purchase money out of the proceeds of burial
lots to be subsequently sold. If the land had been bought
for a specific amount to be paid out of such proceeds, it could
not be doubted that this arrangement would have been per-
fectly legal and unobjectionable. If the agreement actually
made is to be regarded as *ultra vires,* it must be so held, not
because the corporation was without authority to pay the
purchase money out of the proceeds of its sales of lots, but
because it contracted to pay a defined proportion of the pro-
ceeds instead of a designated sum of money. This is not
in our judgment a sufficient ground for declaring the agree-
ment invalid. The vendors could not reasonably have been
asked to depend for payment upon the contingency of future
and uncertain sales of burial lots if the purchase had been
made in the usual way upon the basis of the supposed exist-
ing value of the land. In consideration of their agreement
to make an absolute conveyance without requiring anything
to be paid, either as principal or interest, until the vendee
should be able to convert the property into a cemetery and
effect sales of lots for burial purposes, we think the com-
pany could undertake to pay, as the purchase price, a stated
proportion of the proceeds of such sales without exceeding
its powers or violating any rule of morality or public policy.
It is evident that the agreement in question would not have
prejudiced any of the interests involved if the company
could have maintained its solvency by a ready sale of its
lots. The plan in this instance proved to be impracticable,
but it was not illegal or *ultra vires.* The propriety of trans-

actions of this nature has been affirmatively recognized by federal and State enactments, discussed, respectively, in *Close* v. *Greenwood Cemetery,* 107 U. S. 466, and in *American Exchange Bank* v. *Woodlawn Cemetery,* 120 App. Div. (N. Y.), 119, and *Whittemore* v. *Woodlawn Cemetery,* 71 App. Div. (N. Y.), 257. These cases, however, have not aided our decision of the questions here presented, as the conditions are materially different.

The appellants cited the case of *East Ridge-Lawn Cemetery Co.* v. *Frank,* 77 N. J. Eq. 36; 75 Atl. 1006, in support of their objection to the validity of the agreement. In that case an undertaking by a cemetery company to pay its vendors an undefined proportion of the proceeds of the sale of its burial lots was held invalid under a statute which distinctly contemplated the purchase of the land for a *definite price.* The principle of that decision is not applicable to the statutory conditions with which we have to deal in this case.

It does not follow, however, from the conclusion we have stated, that we are able to accept the theory of the land shareholders as to their rights with respect to the fund now in dispute. The insolvency and dissolution of the corporation have vitally changed the conditions which the purchase agreement contemplated as essential to its due performance. It was obviously assumed by the agreement that the sales of burial lots would currently produce funds sufficient to develop and operate the cemetery after the appropriation of half the proceeds to the land shares. The ability of the company to discharge its contractual duty to the holders of the land certificates was absolutely dependent upon its success in selling the lots with the requisite facility. The project having failed, and the amount realized from the entire property of the corporation being inadequate for the payment of its debts, it does not seem just that the shareholders should be given priority over other claimants whose money developed and made more valuable the estate from which the fund for distribution has been derived.

The holders of the land certificates urge that the agreement defining their rights was a matter of public record, and that those who gave credit for the company did so with notice that they must look exclusively for payment to the portion of the corporate funds not appropriated to the land shares. We do not regard this consideration as controlling under the present conditions. The fund with which we are now dealing was not produced by the *sale of the use of burial lots,* as contemplated by the land agreement, but by a receivers' sale of all the property of the company, including the permanent and expensive improvements to which the shareholders did not contribute. To award them one-half of the money thus realized would not in our judgment be equitable.

On the other hand, we have been unable to adopt the view that the holders of the land certificates should be denied participation in the assets of the corporation until the other claims are paid in full. While these certificates closely resemble in form those usually issued for shares of capital stock, it is clear that the owners of the certificates in this case occupied an altogether different position from that of ordinary stockholders. They were entitled, during the solvency of the corporation, to neither more nor less than the stipulated proportion of its sales. If the company had sold all of its burial lots and had paid half the proceeds to the certificate holders, they would have had no further interest in its property or operations. They at no time had a voice in the meetings of the corporation, and their only relation to it has been that of vendors with claims contingent both as to the amount and time of payment of the purchase money. They were not owners, but creditors of the company, and as such they are entitled to participate with the other claimants. The amount for which they may properly prove against the estate of the insolvent corporation is one-half of the proceeds of sale available for distribution, to be added to their claims on account of the sales of burial lots as to which they have had no accounting. This is the nearest

approach now practicable to the contractual standard for ascertaining the indebtedness of the company to its vendors. The proportion thus indicated should constitute the measure of the shareholders' *claim* but not of their dividends.

In the distribution of the assets of a corporation dissolved because of insolvency the "principles of equity" must be applied. *Clark Co.* v. *Colton,* 91 Md. 217. The conditions here shown make it eminently equitable that all the various classes of claimants, who were alike dependent upon the same means of payment while the company was in existence, should bear in equal proportion the loss resulting from its insolvency and dissolution. In such a case as the present we are convinced that *"equality* is equity."

The decree below postponed the certificates of indebtedness and promissory notes to the open accounts and comptroller's notes in the order of payment prescribed. All of these liabilities, though differing in form, appear to have been contracted for the general purposes of the corporation, and we think there should be no discrimination among them in the distribution of the corporate assets.

The question raised in the exceptions below as to the provision for the investment of $40,000.00 in the name of the purchaser for the care of burial lots already sold was not pressed in the argument on appeal. The lots were sold under an agreement for their perpetual care and maintenance by the company, and it was proper that a stipulation should be made for the assumption of this duty by the purchaser of the cemetery. If such a provision had not been included in the decree, the distribution of the estate might have been complicated, and the dividends of other claimants reduced, by the presentation of claims based upon the executory contract of the company with the lot holders. As suggested by the receivers, in a brief filed on their behalf, the $40,000.00 fund does not in reality form part of the proceeds of sale for distribution. The requirement for its investment in the name of the purchaser is one of the conditions of sale, just as are the provisions that the property be sold subject to the

outstanding mortgage and that the purchaser covenant to set apart and invest a portion of the proceeds of future sales of lots in order to insure their proper care and maintenance. According to the evidence the income from the specified fund will not be in excess of the amount reasonably required to care for the lots previously sold, and we think the plan adopted by the decree for the protection of the interests of the lot holders in this regard was proper and judicious.

In the distribution the holders of land certificates should be treated as creditors with claims aggregating one-half of $165,000.00, being the available proceeds of sale of the cemetery, and in addition one-half of the amounts realized by the company and its receivers from sales of burial lots on account of which the shareholders received no payments. Upon the basis of the total claim thus ascertained the individual certificate holders should share, in proportion to their respective interests, in the *pro rata* division, among all the creditors, of the funds in the hands of the receivers remaining after the payment of the costs and expenses of the proceeding.

> *Order ratifying sale affirmed, and decree*
> *directing sale and distribution of pro-*
> *ceeds affirmed in part and reversed in*
> *part and cause remanded for further*
> *proceedings in accordance with the*
> *opinion, the costs to be paid out of the*
> *fund for distribution.*