**SHERWOOD MEMORIAL GARDENS, INC., (TENNESSEE), Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 14795.

United States Court of Appeals
Seventh Circuit.

July 1, 1965.

Robert E. Johnson, William H. Krieg, and Paul J. DeVault, Indianapolis, Ind., Krieg, DeVault, Alexander & Capehart, Indianapolis, Ind., of counsel, for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen., Harold C. Wilkenfeld and Edward Heilbronner, Attorney, Tax Division, Department of Justice, Washington, D. C., for respondent.

Before SCHNACKENBERG, KILEY and SWYGERT, Circuit Judges.

KILEY, Circuit Judge.

Petitioner Sherwood Memorial Gardens, Inc. seeks to set aside a judgment of the Tax Court confirming, though reducing, the Commissioner of Internal Revenue's deficiency assessment in its 1959 income tax.[1] We affirm.

The facts, as found by the Tax Court and reported at 42 T.C. No. 12, are not in dispute. Sherwood Memorial Gardens, Inc. is a Tennessee corporation organized with the minimum capital of $1,000 and empowered to acquire land for, and to operate for profit, a cemetery business. All but two of its 1,000 shares of stock were owned by Fred W. Meyer, Jr., who served as petitioner's president and on its board of directors. Meyer for many years had been active in the commercial cemetery business.

As a result of discussions between Meyer and Abe Berkowitz, a Birmingham, Alabama lawyer, it was decided, in October, 1955, that Berkowitz, who also was in the cemetery business, and a group of associates would invest in Meyer's proposed Tennessee cemetery venture. A plot of land in Knoxville, Tennessee selected by Meyer and his associates was purchased by Berkowitz and Meyer's wife, Jean Hope Meyer, for $30,000. Berkowitz did not see the land prior to the sale, nor did he know Mrs. Meyer.

By an agreement of October 4, 1955, and as later amended, petitioner issued to Berkowitz and to Jean Hope Meyer 1,000 "certificates of indebtedness" in exchange for the transfer to it of the land in Knoxville and $30,000, the money to be used for development and improvement of the land for use as a cemetery. In the certificates petitioner agreed to pay the holders twenty-five percent of the "base sales price of each and every burial space sold * * * during a period of fifteen (15) years * * *" from

---

1. Because of net operating loss carryovers no deficiencies were found for the years ending September 30, 1957 and 1958.

the date of the first sale. The certificates were transferable only on the books of petitioner by endorsement of the registered owner. Certificate holders could not, and did not, vote or participate in the management of petitioner.

In return for their fifty per cent investments, Berkowitz and his group and Jean Hope Meyer each received twenty per cent of the certificates of indebtedness. The remaining sixty per cent of the certificates were distributed as follows: By means of a "Joint Venture Agreement" Berkowitz designated $18,-000 of the original $30,000 investment as loans to certain persons, including Jean Hope Meyer and Berkowitz's associates. The purported borrowers executed promissory notes to Berkowitz and their certificates were placed in escrow along with the promissory notes, and the escrow agent was to apply the payments from petitioner on the certificates to the promissory notes. When the notes were paid in full they were to be cancelled and the certificates delivered to the makers. By means of this agreement Jean Hope Meyer received 140 units in addition to the 200 units received for her investment. She received 300 more shares by treating sixty per cent of her $30,000 investment as a loan to herself and executing a promissory note to herself, to be repaid from payments on the certificates representing the amount of the loan. As a result of this series of transactions sixty per cent of the certificates were issued to persons who had made no actual cash outlay for them and Jean Hope Meyer became the holder of 640 of the 1,000 units.

Prior to entering into the above agreements, Berkowitz wrote to his associates concerning the expected results of the proposed venture. He told them

> In our opinion, there are certain tax advantages in the holding of such certificates as we shall buy, provided the enterprise is successful, in that sums first received on account will properly apply to reduction of your base cost until your investment shall have been first fully recovered.

The tax impact thereafter may be either at short or long term capital gains rate, dependent upon what we can work out.

\* \* \* \* \* \*

It is not impossible to lose money in a venture of this kind. In fact, I should imagine that it would not be extremely difficult. However, on the assumption that the promoters shall achieve sales comparable to those of their operation in Birmingham, the results could and would be profitable for all of us.

On its income tax returns for 1957 to 1959 inclusive, petitioner reported as amounts paid by it to certificate holders for those years, respectively, $33,877.41, $34,324.15, $18,207.07, and deducted these amounts as the cost of land sold. The Commissioner disallowed the deductions with the explanation that the payments were "distributions with respect to equity capital" and not deductible land costs.

The Tax Court found that the transfers of land and money to petitioner "may be characterized as contributions to equity capital \* \* \* notwithstanding the fact \* \* \*" that the transferors were not shareholders of record. This result is clearly possible if the facts justify that conclusion, Brown Shoe Co. v. Commissioner, 339 U.S. 583, 589, 70 S.Ct. 820, 94 L.Ed. 1081 (1950); Veterans Foundation v. Commissioner, 317 F.2d 456 (10th Cir. 1963), as we think they do in this case.

I

The Tax Court first decided that petitioner's certificates did not represent a bona fide indebtedness, but evidenced instead "a proprietary equity \* \* \* not unlike preferred stock." Petitioner contends that this finding is "clear error," since (a) the holders are entitled to twenty-five per cent of the proceeds of sales regardless of petitioner's net income, (b) holders receive nothing on the certificates after their fifteen year life, (c) holders cannot vote or otherwise manage petitioner, and (d) in case of in-

solvency the holders would be classified as creditors. It relies principally upon Gregory v. Chapman, 119 Md. 495, 87 A. 523 (1913) and American Exchange Nat. Bk. v. Woodlawn Cemetery, 194 N.Y. 116, 87 N.E. 107 (1909) in support of its contention.

Both of those cases involved cemeteries which under state laws were non-profit and could not issue stock in order to acquire capital. Chapman dealt with the question of priorities in distribution of the assets of an insolvent cemetery corporation and held that the land share certificate holders were creditors for the purpose of distribution, and not stockholders. In Woodlawn the question was whether the cemetery was liable to a bank for loans, on land share certificates, made to the cemetery's vice president, who fraudulently issued them. The court held that the certificates were not stock and that the bank was on notice of the cemetery's disability to issue stock. In both cases the courts emphasized the fact that the corporations involved had no other means of acquiring capital than the issuance of land share certificates. This same consideration was emphasized in Commissioner v. Kensico Cemetery, 96 F.2d 594 (2d Cir. 1938), where the court held that holders of certificates issued by a New York not-for-profit cemetery corporation were not shareholders and that the corporation was exempt from income taxes under the statutory exemption for cemeteries operated solely for the benefit of members or not for profit. The court relied on the New York statutes which provided for the establishment of such cemetery corporations and for the issuance of certificates in order to promote the public purpose of encouraging the establishment and maintenance of cemeteries.

Petitioner and its promoters were under no such disabilities in acquiring capital as were the corporations involved in the above cases. It was authorized to, and did, issue capital stock. There appears in the record no reason, except for tax avoidance, why the $60,000 for which the certificates of indebtedness were issued could not have been contributed to the corporation in return for stock, rather than casting the transaction in the form of an indebtedness which created a debt-to-equity ratio of 60 to 1.

The burden of proving that the certificates evidenced indebtedness was on petitioner. Arlington Park Jockey Club v. Sauber, 262 F.2d .902, 905 (7th Cir. 1959). We approve the Tax Court's statement, based on Gooding Amusement Co. v. Commissioner, 236 F.2d 159 (6th Cir. 1956), cert. denied, 352 U.S. 1031, 77 S.Ct. 595, 1 L.Ed.2d 599 (1957), that it was not precluded by the form of the certificates from inquiring into the real substance of the transactions, and that even in form the certificates do not meet the classic criteria of a bona fide debt set out in Gilbert v. Commissioner, 248 F.2d 399 (2d Cir. 1957).[2] Petitioner is not obligated to pay interest, in a fixed amount or otherwise, nor is any principal amount ascertainable and payable in any event. Gloucester Ice & Cold Storage Co. v. Commissioner, 298 F.2d 183 (1st Cir. 1962).

While no one factor is conclusive in determining whether the payments in question were dividends, Commissioner v. Meridian & Thirteenth Realty Co., 132 F.2d 182 (7th Cir. 1942), we think the Tax Court considered and gave weight to the appropriate factors in evidence in reaching its decision that as a matter of economic reality and for the purposes of the federal income tax law petitioner was not a debtor of the certificate holders. Among these factors were petitioner's thin capitalization, totally inadequate for carrying out the corporate purpose, John Kelley Co. v. Commissioner, 326 U.S. 521, 526, 66 S.Ct. 299, 90 L.Ed. 278 (1946); Brake & Electric Sales Corp. v. United States, 287 F.2d

2. "The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." 248 F.2d at 402.

426, 428 (1st Cir. 1961); the speculative nature of the enterprise and the anticipated returns based on sales of lots, recognized by Berkowitz and his group, Milwaukee & Suburban Transport Corp. v. Commissioner, 283 F.2d 279, 282 (7th Cir. 1960), cert. denied 366 U.S. 965, 81 S.Ct. 1920, 6 L.Ed.2d 1256 (1961), vacated in part and remanded 367 U.S. 906, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961); Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902, 905 (7th Cir. 1959); the difficulty in perceiving any reason except tax avoidance for the use by a corporation for profit of the "land shares" method of obtaining land and capital usually employed by not-for-profit cemeteries because of their non-stock character, cf. Kolkey v. Commissioner, 254 F.2d 51 (7th Cir. 1958); and the obvious opportunity for tax avoidance in increasing the basis of petitioner's lots by deducting payments to certificate holders as the cost of land sold and capital gains treatment of these amounts in the hands of the certificate holders. Gregory v. Helvering, 293 U.S. 465, 469–470, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

There is no contention that the Tax Court's findings, based on uncontroverted evidence, are clearly erroneous. We think the Tax Court did not err in concluding from these findings, in light of the factors discussed above, that the certificates actually represent a proprietary interest in petitioner. Gardens of Faith, Inc., T.C.Memo. 1964–178, aff'd per curiam, 345 F.2d 180 (4th Cir. 1965).

■ Petitioner also argues, without merit, that it was taxable only upon its distributive share of income from sales of lots because the Tax Court found that it was a joint venture, which would be treated for tax purposes as a partnership, Int.Rev.Code of 1954, § 761. This contention is based on the Tax Court's statement that the evidence showed the October 4, 1955 agreement was

> no more than a convenient compact between parties who were entering the cemetery (R. 162) business as a joint venture or enterprise.

But the Tax Court further stated that

> a finding of the exact nature of the relationship of the parties to the First Agreement is not necessary * * *.

## II

Under the October 4, 1955 agreement, petitioner, an accrual basis taxpayer, undertook during the life of the certificates to set aside in a separate bank account fifteen per cent of the proceeds of sales of burial lots as a fund for physical development and improvement of the cemetery. This "fund" was separate and distinct from the perpetual care fund, into which petitioner paid twenty-five per cent of receipts pursuant to the laws of Tennessee and its own Burial Space Purchase Agreements. The parties stipulated that no amount of the perpetual care fund was includible in petitioner's gross income.

For the years 1956 to 1959 fifteen per cent of the base sales price and collections on spaces sold would amount to, respectively, $12,721.59, $22,004.70, $20,294.82, and $11,826.21. In its income tax returns petitioner deducted as "cost of improvements" for 1956 $12,721.59, for 1957 $22,004.70, nothing for 1958, and $7,532.20 for 1959. The Commissoner disallowed these deductions and determined that development costs should be taken into account by increasing the basis of each of petitioner's lots sold during the taxable year by an amount equal to the actual expense incurred for development during that year divided by the total number of burial plots remaining for sale in the cemetery. The amounts thus allowed by the Commissioner were: for 1956 $11,712.33, for 1957 $8,994.34, for 1958 $3,948.00, and for 1959 $1,373.44. The Tax Court confirmed the Commissioner's determination.

■ The Tax Court in rejecting petitioner's various contentions correctly stated the law: "[W]here a fund is established by contributing a percentage of sales price of cemetery lots and the fund is to be devoted to development and improvements * * * the amounts that

go into the said fund will be gross income to the cemetery." Mount Vernon Gardens, Inc. v. Commissioner, 298 F.2d 712 (6th Cir. 1962); Gracelawn Memorial Park, Inc. v. United States, 260 F.2d 328 (3rd Cir. 1948); National Memorial Park v. Commissioner, 145 F.2d 1008 (4th Cir. 1944), cert. denied 324 U.S. 858, 65 S.Ct. 861, 89 L.Ed. 1416 (1945); American Cemetery Co. v. United States, 28 F.2d 918 (D.Kan.1928). The Tax Court noted two exceptions to this rule, viz., where the fund is a "definitely established" trust and where the fund is required under a specific agreement with the lot purchasers,[3] but held that petitioner qualified for neither exception.

■ Petitioner was obligated by the First Agreement only to deposit the designated sums in a separate bank account and to use the funds thus deposited for no other purpose than development of the cemetery. At best this provision created merely a contractual obligation, not a trust. But even if the agreement were a trust in form, where, as here, petitioner had wide discretion in use of the fund, with no definite obligation to make any particular improvements and with no necessary relationship between the amount of the fund and the development costs, and the fund was not for care of individual lots, petitioner was the primary beneficiary of the fund and it could not properly exclude the amount of the fund from its gross income. National Memorial Park, Inc. v. Commissioner; Gracelawn Memorial Park, Inc. v. United States, both supra; cf. Oak Woods Cemetery Ass'n v. United States, 345 F.2d 361 (7th Cir., 1965).

The record does not disclose that the fifteen per cent of sales was actually set aside. The Burial Space Purchase Agreements provided only

> That within . . . years from the date hereof, if not previously done, it [petitioner] will design and construct a Garden or Gardens, containing special landscaping, art and architectural features, from which Purchaser may select a plot as above provided.

Petitioner contends that its obligation was definite, however, since a landscape architect prepared maps showing plats and future improvements in the seven planned gardens of the cemetery, which were accepted by petitioner and recorded in the county clerk's office, and since a civil engineer also prepared estimates of the cost of future developments, which petitioner's treasurer allocated to the installment collections made on all sales during the taxable years in question. Most of these plans were completed after a large number of lots had been sold and there is no indication that any of the purchasers knew or were informed of the plans, and no evidence that petitioner was not free to alter the plans at will after they had been accepted.

■ We think that the above considerations also dispose of petitioner's contention that its estimated development costs were an accrued liability which could be deducted prior to the actual expenditures, or in the alternative, that the estimated cost was deductible as cost of goods sold. National Memorial Park, Inc. v. Commissoner, supra; Acacia Park Cemetery Ass'n v. Commissioner, 67 F.2d 700 (7th Cir. 1933); Memphis Memorial Park, 28 B.T.A. 1037 (1933), aff'd per curiam 84 F.2d 1008 (6th Cir. 1936); cf. Schlude v. Commissioner, 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963); American Automobile Ass'n v. United States, 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961). The case of Mount Vernon Gardens, Inc. v. Commissioner, 298 F.2d 712 (6th Cir. 1962), is distinguishable in that the court found there that the fund in question was a definite amount and had been impressed with an irrevocable trust.

We agree with the Tax Court and the Commissioner that cases involving real

---

3. Monte Vista Burial Park, Inc. v. United States, 340 F.2d 595 (6th Cir. 1965); Metairie Cemetery Ass'n v. United States, 282 F.2d 225 (5th Cir. 1960); Commissioner v. Cedar Park Cemetery Ass'n, 183 F.2d 553 (7th Cir. 1950).

estate subdivisions, e. g., Birdneck Realty Corp., 25 B.T.A. 1084 (1932), are not applicable, for there the developers were bound by the purchase contracts to make specific improvements.

Finally, we see no merit in the contention that the Commissioner should not have allocated the actual expenditures to the cemetery as a whole, but separately for each garden under development, since each garden was developed separately. We think the record justifies the Tax Court's conclusion that petitioner's cemetery was an integral unit and that expenditures for roadways, gateways, statues, and other ornimental objects served the entire cemetery and should be allocated to all lots available for sale, not just to the garden being developed.

The judgment of the Tax Court is affirmed.