5 A.3d 1133

**DUMBARTON IMPROVEMENT ASSOCIATION, INC., et al.**

**v.**

**DRUID RIDGE CEMETERY COMPANY, et al.**

**No. 824, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Sept. 29, 2010.

54

Michael R. McCann, Towson, MD, for appellant.

Robert S. Brennen, Baltimore, MD and Jennifer R. Lazenby, Towson, MD (John R. Fischel, Miles & Stockbridge PC, Whiteford, Taylor & Preston, LLP, on the brief) for appellee.

Panel: MEREDITH, WOODWARD, CHARLES E. MOYLAN, JR. (Retired, specially assigned), JJ.

MEREDITH, J.

The Druid Ridge Cemetery is located in Baltimore County in Pikesville, Maryland, on an approximately 200–acre parcel of real property between Reisterstown Road and Park Heights Avenue, north of Old Court Road. The impetus for the current litigation was the plan of the owner-operator of the cemetery to sell a developer 36 acres to be used for construction of 56 semi-detached dwellings. A number of neighboring property owners joined with several persons who had purchased burial rights in the cemetery, asking the Circuit Court for Baltimore County to issue a declaratory decree that the cemetery property could be used solely for cemetery purposes.[1]

---

1. The appellants are the plaintiffs who filed the complaint: Doris Miller, owner of a crypt and burial lots in the cemetery; Albert and Janet Nahum, owners of a crypt; Henry and Babette Gutman, owners of a burial lot; Sharon Rosen, owner of neighborhood property; Howard and Alice Moffet, owners of neighborhood property; the Dumbarton Improvement Association, Inc., a community association representing a neighboring community; and the Long Meadow Association, Inc., a community association representing neighboring property owners. The appellees are the defendants named in the complaint: Druid Ridge

The circuit court concluded: (1) that the restrictive covenant in the 1913 deed for the cemetery does not preclude the proposed sale of 36 acres for residential development; and (2) even if the scope of the restrictive covenant had originally been intended to prevent the proposed development, there has been such a radical change in the vicinity since 1913 that the restriction is no longer enforceable as to the proposed sale of the isolated 36 acres that are the subject of this suit.

The opponents of the sale argue in this appeal that the circuit court erred in its construction of the restrictive covenant and in concluding that the restriction should be limited due to changed circumstances. We perceive no error, however, in either of the circuit court's conclusions. Because either conclusion would provide an adequate basis for upholding the judgment of the circuit court, we shall affirm.

## Background

When the Druid Ridge Cemetery held its opening ceremonies in 1898, its planners were praised for ushering in a new era in cemetery design, one in which the grounds were laid out like a park. The original owners and developers of the cemetery ran into financial difficulties, however, and in 1910, creditors forced insolvency proceedings that ultimately led to a court-ordered sale of the cemetery real estate to the current owner of record, Druid Ridge Cemetery Company. The 1913 deed to Druid Ridge Cemetery Company contains restrictive language that is the source of the argument against the currently proposed sale of a portion of the land. In the deed, the grantee covenants and agrees: "That the said property be maintained and operated as a cemetery."

After reviewing the extensive evidence that was presented in this case relative to events leading up to the 1913 deed, the trial judge, Judge Kathleen Gallogly Cox, recounted the histo-

Cemetery Company, the corporation that has owned and operated the Druid Ridge Cemetery since purchasing the property in March 1913; Stewart Enterprises, Inc., a corporation that owns the Druid Ridge Cemetery Company; and Druid Ridge, L.L.P., the contract purchaser of 36 acres land from Druid Ridge Cemetery Company.

ry of the Druid Ridge Cemetery in a written opinion that we will quote at length as follows (omitting citations to trial exhibits):

> The origins of the Cemetery date back to the late 1800s when Charles Tyler entered into an Agreement dated January 14, 1896 with the Druid Ridge Cemetery of Baltimore County for the sale of a portion of his land. As part of that Agreement, the parties covenanted:
>
>> That the said lands, or such parts thereof as may from time to time be required for Cemetery purposes, shall be surveyed and sub-divided into lots or plats of suitable size for burial and ornamental purposes, with such Avenues, paths, alleys and walks as may be proper and that when so surveyed and subdivided the use of said lots and plats shall be sold and conveyed. . . .
>
> Pursuant to this Agreement, 10,000 shares were to [be] issued, with Charles Tyler retaining 7,000 of those shares. The Agreement was binding upon the parties and their successors and assigns. However it also reserved the right of the parties to alter or amend its provisions by a two-thirds vote.
>
> On May 23, 1897, the Deed contemplated by the Agreement was executed to convey approximately 200 acres of the Tyler land from Charles Tyler to the Druid Ridge Cemetery Company of Baltimore County. The recitals in that Deed state:
>
>> To Have and To Hold the tract or parcel of land and premises above described and mentioned, and hereby intended to be conveyed, together with the rights privileges, appurtenances and advantages thereto belonging or appertaining unto the proper use and benefit of the said "Druid Ridge Cemetery of Baltimore County," its successors and assigns in fee simple.
>
> This 1897 Deed contains no restriction on the use of the Property, and it contains no reference to any intent to create a cemetery.

The Cemetery was dedicated on June 11, 1898, and it was hailed as "one of the handsomest burial places in the State of Maryland." As stated in the dedication ceremony, "Druid Ridge Cemetery marks a new era in resting places of the dead, and is to be conducted on a new principle. It is to be a departure from old methods to the newer, more cheerful, broader and at the same time more perfect method of disposing of departed friends."

Legislation was enacted in 1900 to permit the use of this large tract of land for a cemetery. Pursuant to the legislation, Druid Ridge Cemetery of Baltimore County was empowered to "purchase, hold or use for the purpose of burial two hundred acres of land in said County, and to perpetuate its charter."

However celebrated the dedication and initial operation may have been, the financial aspects of the business quickly deteriorated. A receivership action was filed on October 19, 1910. As reflected throughout the documents that remain from those proceedings, the receivership was complicated by the need to balance the concerns of interred parties and of plot holders with the rights of the business, its investors, and its creditors. As recommended in the May 1, 1911 Report of the Receivers:

Your Receivers further recommend that this Honorable Court in any decree for the sale of the property will be justified in requiring that the purchaser not only continue the Cemetery but to provide in some reasonable way for the perpetual care of lots already sold. This requirement would be reasonable we submit, because the property is more valuable for Cemetery purposes than any other at the present time with the Cemetery well established; and the perpetual care of the lots already sold will be an insignificant item, and a necessary requirement in order to give the Cemetery a reasonable neat and clean appearance.

Given the competing interests and demands, the Court scheduled a hearing on the receivership. Testimony reflected that by 1911 approximately 11 acres of the parcel

were used for cemetery plots, with approximately 60 to 65 acres of lawn. Another 40 acres of the parcel was used actively as farmland. Approximately 12 to 13 acres adjacent to Park Heights Avenue, known as the Park Hill Plot, remained wooded. Thus a relatively small percentage of the land was used for burial purposes.

Following the proceedings, the Honorable Frank I. Duncan issued an Opinion and stated:

> It is seldom that a case comes before the Courts involving more conflicting interests or presenting a more complicated situation than the case at bar and for the reason that the Defendant corporation has its origin in a most novel (and in Maryland) most unusual contract, i.e., the contract of the Cemetery Company with Tyler, the owner of the land to be used for cemetery purposes.

> \*       \*       \*

> My judgment therefore is that the land of the corporations consisting of about 200 acres, more or less, and all personal property should by the Receivers be sold as and for a cemetery upon such terms as the Receivers in their discretion shall deem most advantageous ... except that the purchaser will be required to set apart and invest out of the purchase price the sum of $40,000 to provide for the perpetual care of the lots already sold and to covenant to set apart a sufficient sum from lots by the purchaser thereafter sold to invest for the permanent maintenance thereof.

The ensuing Order dated March 21, 1912, reflected this provision.

The Receivers then petitioned the Court to modify the language of the decree in order to promote the appropriate disposition of the property. As the Receivers stated: "Criticism has been made that it will not be necessary or desirable to use the whole 189 acres as a cemetery, but that a considerable part of it can be much better used for other purposes, without injury to the Cemetery property." Therefore the Receivers requested the Court to modify the

provisions of its Order. In response, on April 19, 1912, the Court struck from its Order the requirement that the property be maintained and operated as a cemetery and the provision requiring investment of certain portions of the proceeds from lot sales for perpetual care of the lots. The Court "reserv[ed] for future determination the question of how much, if any, of said property shall be required to be maintained as a Cemetery and also what portion, if any of the proceeds of lots hereafter sold must be invested for the perpetual maintenance and care of said lots."

In the meantime, the Receivers had advertised the property for sale, subject to the provisions of the original Court Order. The Report of Sale of the Property to the Druid Ridge Cemetery Company describes the land as follows:

> The property conveyed by said deed of January 14, 1896, comprises 200 acres, through which about 2½ miles of 20 foot roads have been laid off, and of which about 11¼ acres have been sold as burial lots. A plat showing the mode of laying out the cemetery, the lots already sold, and the property unsold, can be seen. . . .

> The property has been beautifully laid out and developed for cemetery purposes; and 2½ miles of avenues have been built, a marble mausoleum . . . and other fine improvements have been constructed, and the property is in everyway [sic] for successful operation as a cemetery.

> The property will be sold . . . subject to the following conditions:

> (1) That it be maintained and operated as a cemetery.

The ensuing Deed reflected these conditions, as previously noted.

Various interested parties appealed the receivership proceedings. The restrictions in the Deed were not addressed on appeal. However the Court noted that the interest held by plot owners placed them in the position of a creditor only, and did not entitle them to an actual interest in the real property. The Court also affirmed the provisions in the sale that required funds to be set aside for perpetual

care of the property as a proper use of the court[']s equitable powers. As it noted, had no such provision been made, the distribution of the receivership estate might have been complicated by the presentation of other claims based upon the contracts between the company and the plot owners. Thus the provisions advanced the equitable resolution of conflicting claims. *Gregory v. Chapman,* 119 Md. 495, 497–99 [87 A. 523] (1913).

Eighty-six years after acquiring the cemetery land from the receivers, the Druid Ridge Cemetery Company entered into a contract in 1999 to sell approximately 36 acres of the cemetery property to Druid Ridge, L.L.P., a developer that proposed to construct 56 semi-detached dwellings upon the property. The acreage that is the subject of the proposed development is separated from the currently developed portion of the cemetery by a large wooded tract and a stream.

Opponents of the proposed development filed suit, seeking declaratory and injunctive relief. At trial, the individual appellants testified that the cemetery has long been used as a public park, and they have enjoyed visiting the cemetery for recreational activities such as walking, ice skating, picnicking, jogging, and bicycling. They testified that their use of the cemetery would be impaired by the proposed residential development because of an increase in traffic and the change from the current park-like setting. Nearby residents testified that the increase in traffic would have a negative impact upon them as well.

Owners of burial plots testified that they were issued a booklet explaining the rules and regulations of the cemetery at the time of their purchases. The rules and regulations include the following statement: "This cemetery is dedicated and shall be used only for cemetery purposes."

The developer introduced testimony showing that little of the development would be visible from the currently improved areas of the cemetery because of the barrier the woods provide. In addition, experts testified that the woods and stream separating the parcel pose logistical and environmental

challenges to developing the parcel as grave sites. Representatives of the cemetery testified that no graves would need to be moved if the parcel was developed, and the public would be able to continue to visit and enjoy the remainder of the cemetery in the same way they currently do. One expert testified that the main portion of the cemetery has sufficient space to meet demand for grave sites for approximately the next century. Another expert opined that, if the parcel proposed for development was used for burial sites instead of homes, the burial spaces provided by the 36 acres would be consumed in twenty-seven years.

An expert in the field of "real estate economics," who had been "asked to write a report showing statistically the nature and magnitude of the change in the economic and demographic environment around the cemetery parcel between 1913 and today," testified: "[S]ince 1913 there have been tremendous changes in the economic and demographic environment across multiple dimensions." He commented: "I think we can agree that you don't have to be an economist[;] any layperson can figure out there have been significant shifts since 1913." He noted: "As late as 1930, one hundred percent of [Baltimore] County's population was deemed to be rural." Between 1910 and the time of trial, the population of Baltimore County had grown from 122,000 to nearly 800,000. "Pikesville's population has expanded by leaps and bounds." The witness did not have data showing the population of the Pikesville area in 1913, but noted that, according to one source, the population of the Pikesville area was only 175 in 1881; the population of the Pikesville area was approximately 31,000 in 2008.

The economics expert also noted that the construction of the Baltimore Beltway in 1962, just north of the cemetery property, had made the neighborhoods surrounding the cemetery "more attractive for both residential and commercial development." When asked whether he had been "able to determine whether there had been a change in the economic and demographic landscape in the areas surrounding the cemetery from 1913 to the present," the expert replied: "I think the data speak very clearly on this, that there has been a radical or

dramatic shift in the economic and demographic environment since 1913. And that shift continues to this day." Because of the change in the area surrounding the cemetery, "leaving [the 36–acre parcel] as surplus cemetery land would be suboptimal. Leaving this as surplus cemetery land from a public policy perspective doesn't make much sense." The expert explained that, at the time the cemetery was established, because of the rural nature of Baltimore County, landowners did not then have the same kind of concerns about efficient land utilization that developers do today.

After the trial, Judge Cox issued a written opinion, in which she concluded that the appellants "are not entitled to relief on any of the claims set forth in the Petition." She summarized her conclusions as follows:

> The covenant at issue was not intended to restrict alienation of all undeveloped land encompassed in the 1913 Deed. Further, given the radical changes in the surrounding community, the covenant is no longer viable. Accordingly, the Petition seeking a declaration that defendants be prohibited from selling the Development Parcel for purposes of residential development must be denied.

With respect to the trial court's conclusion that the covenant in the 1913 deed—"[t]hat the said property be maintained and operated as a cemetery"—should not be construed to preclude all of the acreage from being used for any purpose other than a cemetery, the court explained that the rules governing construction of a covenant were summarized by the Court of Appeals in *Belleview v. Rugby Hall,* 321 Md. 152, 157–58, 582 A.2d 493 (1990), as follows:

> In construing covenants, "[i]t is a cardinal principle . . . that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself." *Live Stock Co. v. Rendering Co.,* 179 Md. 117, 122, 17 A.2d 130 (1941). The language of the instrument is properly "considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property. . . ." *Levy v. Dundalk Co.,* 177

Md. 636, 648, 11 A.2d 476 (1940). This principle is consistent with the general law of contracts. *See Anne Arundel County v. Crofton Corp.,* 286 Md. 666, 673, 410 A.2d 228 (1980) (court, in construing agreement, must first determine from the language of the agreement itself, what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated). If the meaning of the instrument is not clear from its terms, "the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources." *Live Stock Co. v. Rendering Co., supra,* 179 Md. at 122, 17 A.2d 130.

If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement. *Martin v. Weinberg,* 205 Md. 519, 526, 109 A.2d 576 (1954); *Himmel v. Hendler,* 161 Md. 181, 187, 155 A. 316 (1931); *Guilford Ass'n Inc. v. Beasley,* 29 Md.App. 694, 699, 350 A.2d 169, *cert. denied,* 277 Md. 735 (1976). The rule of strict construction should not be employed, however, to defeat a restrictive covenant that is clear on its face, or is clear when considered in light of the surrounding circumstances.

> The courts seem to have generally recognized that there is no public policy against a fair and reasonable construction, in the light of surrounding circumstances, of restrictions designed, in general, to accomplish the same beneficial purposes as zoning.

*Martin v. Weinberg, supra,* 205 Md. at 527, 109 A.2d 576.

> The courts, it would seem, are under a duty to effectuate rather than defeat an intention which is clear from the context, the objective sought to be accomplished by the restriction and from the result that would arise from a different construction.

*Guilford Ass'n, Inc. v. Beasley, supra,* 29 Md.App. at 700, 350 A.2d 169.

Judge Cox concluded that the language of the cemetery covenant in the 1913 deed "reflects an intent to burden the land with a requirement that the cemetery operation be preserved." Nevertheless, she determined that the restrictive language was ambiguous as to its scope because "[i]t is unclear the extent to which the 'said property' is to be maintained and operated as a cemetery." The court noted that, at the time the 1913 deed was executed, "large portions of the nearly 200 acre parcel were not used as a cemetery." Because the deed did not expressly state "the extent and nature" of the required cemetery usage, the trial court sought to determine from the evidence the parties' intent on that point. The court stated:

> The determination of intent in this case is complicated by this procedural posture, as this [1913] Deed was not the subject simply negotiated by parties to a contract. Rather, the Deed was issued by receivers, overseen by the Court, following fairly complex proceedings attempting to balance competing rights and claims. It is noteworthy that there was no restriction in the original 1896 Deed from Tyler to Druid Ridge Cemetery of Baltimore County that restricted the use of the Property for cemetery purposes. In the receivership proceedings, the suggestion of use as a cemetery was seemingly made to protect against claims and to preserve the reasonable expectations of plot owners. In addition, it was perceived at that time that use as a cemetery was the most advantageous disposition. However as soon as the Receivers indicated that the restriction for use as a cemetery might actually impede the sale, the Court struck the provision from the order authorizing the sale of the property.

> In a receivership proceeding, it is not the function of the Court to make a value judgment concerning the appropriate use of the property. Rather, the proceeding allows the Court to appoint temporary receivers or trustees to take charge of the assets and operate the business pending final determination concerning dissolution and distribution of property. The intent is to preserve, maximize, and appro-

priately dispose of property, and to allow for the orderly distribution of assets among creditors and investors.

Having weighed and considered the evidence presented, including the documents from the receivership proceedings discussed above, I do not believe that the Court intended to require the Receivers to limit the scope of use of the entire parcel for cemetery purposes only. Rather, I find that the Court intended to require the continued operation of the existing cemetery in a manner that provided for the maintenance and care of the graves and attendant structures, and that honored the obligations to existing plot owners.

The entire 200 acres has never been used as a "cemetery." Although a large segment of the property had been developed as a lawn surrounding the burial sites by 1913, nearly two thirds of the parcel remained unused or was used for other purposes. In fact, part of the land at that time was still actively being farmed. There is nothing in the record to suggest that the Court, through the receivers, intended to restrict all such other uses.

This conclusion is buttressed by actions taken since the time of the sale. There have been a number of other transactions where portions of the property have been sold, or easements granted for uses other than as a cemetery.[Trial Court's Footnote]7 Testimony established that a nursery was operated for some period of time on the Development Parcel.

[Trial Court's Footnote 7:] Six conveyances from the original parcel were identified in the testimony, including a 1921 fee simple conveyance, a later conveyance to a railway company, a 1967 deed to Martex properties, along with a 1993 ground lease to Martex for parking, a 1999 conveyance to Maryland National Bank, and a 1989 drainage easement for the Fields of Stevenson community.

It also is extremely unlikely that the full 200 acres will ever be used actively as a cemetery. There is already an inventory of developed property that will meet the need for the sale of plots, at the present rate, well into the future. While projections of the rate of use border on sheer speculation, particularly in light of changes in the death care industry and the increased use of cremation alternatives,

the evidence was abundantly clear that the current inventory of available sites is likely sufficient to last through this century.

*    *    *

There simply was never any intent to restrict all 200 acres for use as a cemetery only. Rather, the intent at the time was to require continued operation of the existing cemetery, and to provide for perpetual care of the grounds and graves. There was no intent to restrict alienation of the other undeveloped portion of the parcel.

Based upon that finding as to the intent of the parties to the 1913 deed, the trial court held that the proposed sale of the 36–acre parcel was not precluded by the covenant.

In the alternative, the trial court found that there had been a radical change in the neighborhood, citing *Bowie v. MIE,* 398 Md. 657, 687, 922 A.2d 509 (2007) ("Our cases establish that chief among the factors considered in evaluating the present circumstances relevant to determining the continuing validity of a restrictive covenant is whether there has been a 'radical change in the neighborhood causing the restrictions to outlive their usefulness.' *Chevy Chase Village v. Jaggers,* 261 Md. 309, 316 275 A.2d 167, 171 (1971) . . . ."). The trial court made reference to the *Bowie* opinion's comment that "the question of validity is a combination of a reasonable period of elapsed time and frustration of purpose in light of changed circumstances occurring over that time." *Id.* at 691, 922 A.2d 509.

The trial judge observed that the parties had presented conflicting evidence as to whether the parcel proposed for residential development would ever be used for burial purposes and whether there had been a radical change in the neighborhood. The court found that the evidence on both points weighed against enforcing the restriction to preclude the sale of the 36–acre parcel. The court stated:

> [T]he ability to develop property that includes any type of wetland has become enormously more complicated in recent years. While it may be conceivable that Druid Ridge

[Cemetery Company] could engineer a solution that would allow them to bridge the stream and access the Development Parcel to put graves in that area, it is neither practical nor remotely likely to occur. In the first instance, the Cemetery Company has no need, either now or in the foreseeable future, to expand the usable cemetery space. Even if they had such a need, there is still abundant other undeveloped property within the Cemetery that does not pose environmental challenges with their attendant costs. There is no reasonable likelihood that the Development Parcel will ever be put to use for burial purposes.

The evidence of "radical change" in the surrounding area also exists. The time frame at issue in this case is nearly a century. While it was undoubtedly predictable in the early 1900s that development would continue gradually along the roadway spokes leading out of Baltimore City, the extent of that change and its impact on the rural areas outside the city could not have been expected. Population growth, transportation changes, the explosion of commercial and retail development, and the increases in housing density are just the tip of the iceberg. There is nothing about this area now that is even remotely similar to the rural setting that existed when this Deed was executed.

. . . The intent of the covenant in the Deed was to protect the cemetery operation and to guarantee its continued existence. That purpose is fulfilled without restricting the use of land in the Development Parcel.

### Discussion

■ Although we are persuaded that the trial court's analysis was correct on both the construction of the scope of the covenant as well as its continued validity, we turn first to the ruling based upon the court's finding that there had been a radical change in the neighborhood. As the Court of Appeals noted in *Bowie, supra,* 398 Md. at 692, 922 A.2d 509: "We do not disturb a trial court's findings of fact on the question of changed circumstances absent clear error." *See* Maryland Rule 8–131(c).

In the present case, there was ample evidence in the record to support the trial judge's finding that there had been a radical change in the neighborhood of Druid Ridge Cemetery subsequent to the receivers' sale of the cemetery in 1913. That finding was not clearly erroneous. There was also evidence to support the trial judge's finding that there was "no reasonable likelihood" that the 36–acre parcel "will ever be put to use for burial purposes." Given those findings, the trial court's refusal to apply the covenant to preclude a sale of the 36–acre parcel satisfies the " 'changed circumstance' standard for covenant analysis" announced by the Court of Appeals in *Bowie,* 398 Md. at 687, 922 A.2d 509. On this basis alone, we would affirm the judgment of the circuit court even if we did not agree with the court's analysis of the proper interpretation of the 1913 covenant.

But we also agree with the trial court's analysis that there is ambiguity in the covenant with respect to the nature and extent of the restriction. As the Court of Appeals explained in *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999), "a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more than one meaning." The Court noted that the question of whether language is ambiguous is a question of law that considers the purpose of the contract and the facts and circumstances of the parties at the time the contract was made. *Id.* at 435–36, 727 A.2d 358. If the appellate court agrees with the trial court's conclusion that the language is ambiguous, "it will apply a clearly erroneous standard to the trial court's assessment of the construction of the contract in light of the parol evidence received." *Id.* at 435, 727 A.2d 358.

Although the covenant—"[t]hat the said property be maintained and operated as a cemetery"—clearly reflects a commitment to continue cemetery operations upon the land, the deed does not specify that 100% of the property be utilized solely or exclusively for cemetery purposes in perpetuity. As the Court of Appeals observed in *SDC 214, LLC v. London Towne Prop. Owners Ass'n,* 395 Md. 424, 437, 910 A.2d 1064

(2006), "'it is not the province of this Court to supply a missing' word or phrase in a restrictive covenant." (Quoting *Sowers v. Holy Nativity Church,* 149 Md. 434, 442, 131 A. 785 (1926)). Nor does the deed include any reverter language or other cautionary statement about using some portion of the property for purposes other than a cemetery. Given the circumstances of the parties when the deed was executed, including the fact that a substantial portion of the property was being used at that time as a farm, one reasonable reading of the covenant would have been that the requirement to use the property to maintain and operate a cemetery did not extend to every square foot of the nearly 200 acres. Rather, under the circumstances, a reasonable person in the position of the purchaser might have read the covenant as requiring that the area that was then being utilized as a cemetery would be restricted to being used for the maintenance and operation of a cemetery.

When the trial court considered extrinsic evidence to resolve the ambiguity as to nature and extent of the cemetery restriction, the court found that it could not have been the intent of the parties to mandate that the entirety of the acreage be used solely for cemetery purposes and no other use. This finding was supported by the evidence that 40 acres of the "said property" was being used for farming operations at the time of the conveyance. Accordingly, the trial court was not clearly erroneous in finding that "[t]here simply was never any intent to restrict all 200 acres for use as a cemetery only." Nor was there clear error in the trial court's finding that, although "the intent at the time was to require continued operation of the existing cemetery, and to provide for perpetual care of the grounds and graves[, t]here was no intent to restrict alienation of the other undeveloped portion of the parcel." Accordingly, we agree with the trial court's construction of the restrictive covenant as not barring the sale of the 36–acre parcel that is the subject of this litigation.

Appellants also raised an issue challenging the trial court's dismissal of Stewart Enterprises, Inc. (the parent company of

Druid Ridge Cemetery Company) at the close of the plaintiffs' case. The motion to dismiss was granted pursuant to Rule 2–519(b) because there was no evidence that the parent company was an owner of the any cemetery land or a party to the contract to sell the 36–acre parcel. In light of our conclusion that the circuit court did not err in granting no relief to the appellants, the issue appears moot at this point.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**